## LE VINE et al. v. WHITEHOUSE et al.

No. 2069. Decided Fenbruary 10, 1910 (109 Pac. 2).

1. APEAL AND ERROR—CROSS-ASSIGNMENTS OF ERROR—NECESSITY. A question raised by respondents is not presented for review without a cross-assignment of error. (Page 267.)

2. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—MUTUALITY OF OBLIGATION. A contract sought to be enforced provided, *inter alia,* that if the purchasers failed to make any of the payments mentioned for a period of sixty days after the same became due, vendors should be "released from all obligations to convey the property," and the purchasers would "forfeit all right thereto and to any money paid under the agreement." *Held,* that it did not lack mutuality of obligation. (Page 268.)

3. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—MUTUALITY OF OBLIGATION. Comp. Laws 1907, sec. 2463, provides that every contract for the sale of any lands, or interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing and subscribed by the party by whom the sale is to be made, or by his lawful agent thereunto lawfully authorized in writing. Section 2467 provides that every agreement that by its terms is not to be performed within one year shall be void unless it, or some note or memorandum thereof, be in writing and subscribed by the party to be charged therewith. *Held,* that contracts of the kind referred to therein, to be binding and enforceable, need be signed by vendor only, and specific performance will not be denied for lack of mutuality because not signed by the purchaser.[1] (Page 268.)

[1] Bailey v. Leishman, 32 Utah, 132, 89 Pac. 78.

4. FRAUDS, STATUTE OF—AUTHORITY TO PURCHASE LAND—NECESSITY OF WRITING. That authority of agents to purchase land was not in writing does not invalidate a contract signed by them; there being at the time the agreement was entered into, no statute in this state requiring an agent's authority to purchase land to be in writing.  (Page 271.)

5. CONTRACTS—RESCISSION FOR FRAUD. A party who has been induced to enter into a contract by false and fraudulent representations may rescind on discovery thereof.  (Page 272.)

6. CONTRACTS—RESCISSION FOR FRAUD—LOSS OF RIGHT. A defrauded party will generally lose his right to rescind if he takes any benefit under the contract, or does any other act implying intent to abide by or affirm it, after he becomes aware of the fraud.  (Page 272.)

7. CONTRACTS—RESCISSION FOR FRAUD. A party misled must, as soon as he learns. the truth and discovers the falsity of statements relied on, disaffirm the contract with all reasonable diligence, and he cannot derive all possible benefit from the transaction and then claim relief from his own obligation by a rescission or refusal to execute.  (Page 273.)

8. VENDOR AND PURCHASER—RESCISSION FOR FRAUD—WAIVER OF RIGHT. After vendors learned that corporate stock given in payment of seven hundred dollars on the price had no actual or market value, they continued for eleven months to accept payments on the contract, aggregating six hundred dollars, and made no claim for rescission for misrepresenting the value of the stock till sued for specific performance, when they filed an amended answer nearly two and one-half years after they discovered the fraud which they claimed was practiced on them. *Held*, that they waived whatever right they had to rescind therefor.  (Page 273.)

9. VENDOR AND PURCHASER—BREACH OF CONTRACT—FAILURE TO PAY TAXES. A contract by which vendors, on receiving payment, agree to execute a good and sufficient warranty deed to the property described, free and clear from all incumbrances except that the purchasers shall pay the taxes for a specified year, contemplated that the taxes for that year might become delinquent when final payment was made, and that in that event vendors might convey subject to an incumbrance for such taxes, and hence failure of the purchasers to pay the same was not a breach.  (Page 273.)

10. VENDOR AND PURCHASER—BONA FIDE PURCHASER—NOTICE PUTTING ON INQUIRY. Where, if purchasers, with ordinary diligence, had followed the line of inquiry suggested by information furnished them by vendor before paying any part of the purchase money, they would have been fully advised of an equity of third persons in the land, they are charged with the same knowledge as to their rights as they would have acquired had they pursued the investi-

gation suggested, and they were not relieved from inquiring by assurances that the contract on which the equity was based was abandoned. (Page 278.)

11. VENDOR AND PURCHASER—BONA FIDE PURCHASER—EVIDENCE. Evidence *held* to show that a certain party was not a bona fide purchaser without notice. (Page 279.)

12. SPECIFIC PERFORMANCE—KEEPING TENDER GOOD—NECESSITY. Plaintiffs suing for specific performance tendered the money when they demanded execution of a deed to land involved, and in their complaint alleged they were ready and willing to perform their part of the contract. *Held*, that this entitled plaintiffs to prevail without a tender into court; the decree for plaintiff's in such case being made conditional on payment within a specified time. (Page 279.)

13. SPECIFIC PERFORMANCE — RECIPROCAL DEMMANDS — CONDITIONAL DECREE. Where there are reciprocal demands, and anything remains to be done by one obtaining a decree for specific performance, which, in equity and good conscience, he ought to .do, the court may and usually does, make the decree conditional that, in case of his failure to do what remains for him to do, the petition on which relief is granted will be dismissed. (Page 279.)

14. INTEREST—SUSPENSION—KEEPING TENDER GOOD. To discharge interest, a tender must be kept good by payment into court. (Page 280.)

Appeal from District Court, Third District; *Hon. T. D. Lewis,* Judge.

Action by Catherine E. Le·Vine and another against J. W. Whitehouse and others.

Judgment for defendants. Plaintiffs appeal.

REVERSED.

*W. D. Riter* and *M. E. Wilson* for appellants.

*Smith & Price* and *Hurd & Hurd* for respondents.

McCARTY, J.

This is an appeal from a judgment rendered in the district court of Tooele County, Utah, wherein the plaintiffs sought to have specifically enforced a written contract signed

by the defendants J. W. Whitehouse and his wife, Ettie Whitehouse, in which they agreed to sell and convey to the plaintiffs, and the plaintiffs agreed to buy of them, certain real estate situate in Tooele County, Utah, consisting of about two hundred acres of land, for the sum of $2000. This agreement was signed by Louis Le Vine for Catherine E. Le Vine, his wife, as her attorney in fact, and by Milando Pratt for Elizabeth R. Pratt, his wife, as her attorney in fact. Seven hundred dollars of the purchase price was to be paid in shares of stock of the Bingham West Dip Tunnel Company, a corporation, which stock the vendors agreed to accept in lieu of $700 in cash. The balance of the purchase price, $1300, was to be paid as follows: "$100 in cash upon the delivery of the agreement, and $100 to be paid to the vendors at Lincoln, Utah, each sixty days thereafter for a period of fourteen months," within which time the whole of the purchase price was to be paid. The vendees were to pay all taxes for the year 1905 and thereafter should the agreement be extended. The agreement further provided that: "In the event that the second parties (plaintiffs herein) shall fail or neglect to make any of the payments as hereinbefore provided for the period of sixty days after the same shall become due, then the first party shall be released from all obligations to convey said property, and second parties shall forfeit all right thereto and to any money paid under this agreement, and this agreement shall become null and void. And the said parties of the first part, on receiving such payments as hereinbefore provided, agree to execute and deliver to said parties of the second part, or their assigns, a good and sufficient deed to said property herein described, the title thereto to be free from all incumbrances (except that the second parties shall pay the taxes for the year 1905.) . . . .First parties further consent that second parties may have possession of said premises upon the execution and delivery of this agreement." This agreement was filed for record, and recorded, February 21, 1906, in the office of the county recorder in Tooele County, Utah.

It is alleged in the complaint that the plaintiffs, shortly after the date of said agreement went into possession of the land therein described, and, at the time of the execution and delivery of the agreement, paid and delivered to the vendors 1400 shares of the stock of the Bingham West Dip Tunnel Company which the vendors accepted in lieu of $700 in cash; that the vendees paid the vendors $100 at the time the agreement was entered into and $100 on January 1, 1905, and $100 each sixty days thereafter, the last payment being made on November 8, 1905, for the installment due on November 1, 1905; that before the expiration of sixty days from January 1, 1906, when the next installment fell due, the plaintiffs offered and tendered to the vendors, at Lincoln, Tooele County, Utah, the balance of the purchase price, amounting to $600, together with interest at the rate of eight percent. per annum on the sum of $100 from January 1, 1906, and the taxes assessed against said property for the year 1905. Plaintiffs further allege a full performance of all the conditions in the agreement on their part to be performed, and further allege that the vendors refused to perform; and, after setting out that the vendors were contriving to defraud plaintiffs of the land described in the agreement by executing a deed of conveyance to Theodore G. Schulte, prayed a specific performance of the agreement, and that said "Schulte may be decreed to surrender and convey the said lands to the plaintiffs, the plaintiffs being ready and willing, and hereby offering, specifically to perform the said agreement."

Defendants admit the execution of the agreement in question, and admit the payments alleged in plaintiffs' complaint, but they allege that the payments were made by Louis Le Vine on behalf of himself and Milando Pratt and not otherwise; that neither Louis Le Vine nor Milando Pratt had power of attorney or other written, or any, legal authority from plaintiffs or either of them to execute or enter into the agreement mentioned on behalf of plaintiffs or either of them; that neither of the plaintiffs were bound, or in any manner obligated, thereby; and that no mutuality ex-

isted in relation thereto between them and defendants. It is further alleged in the answer that Louis Le Vine and Milando Pratt, as agents of plaintiffs, falsely and fraudulently represented the value of the 1400 shares of stock, at the time it was received by defendants as part of the purchase price of the land in question, to be of the value of fifty cents a share, and further falsely and fraudulently represented that, if defendants would accept the 1400 shares of stock as part of the purchase price of the land at fifty cetns a share, the said Louis Le Vine and Milando Pratt would purchase the said 1400 shares of stock from the defendants at any time after the execution of the agreement that defendants would make demand upon them for the purchase of the whole of said stock; that defendants relied upon these statements, and were thereby induced to enter into the contract mentioned and to accept said stock in lieu of $700; that the stock was not worth fifty cents per share or any other amount whatever; and that the same was, and still is, entirely worthless, all of which was known to Louis Le Vine and Milando Pratt, and unknown to the defendants. Defendants further allege: "That the said defendants J. W. Whitehouse and his wife thereafter upon numerous and divers occasions requested the said Louis Le Vine to take the said stock and pay them the said sum of fifty cents per share, or to sell the same for them at that price according to his said promise and agreement, but that he failed, neglected, and refused, and still does fail, neglect, and refuse, to do so." Defendants further allege that the plaintiffs failed and neglected to pay the taxes assessed against the land in question for the year 1905. They also allege that a few days prior to November 15, 1905, Louis Le Vine informed the defendants that the plaintiffs would not pay the taxes or any part thereof, neither would they pay any more money on the purchase price of the land, and that Louis Le Vine then and there requested defendants to sell the land on such terms and conditions as they thought proper, provided Louis Le Vine should receive what money had been paid thereon and the 1400 shares of stock which

had been issued to defendants as part of the purchase price
of the land; that thereupon the defendants began to negoti-
ate for the sale of the land, and on or about the 29th day of
January, 1906, the defendants J. W. Whitehouse and his
wife sold the land in question to Theodore G. Schulte, their
codefendant.

Upon the issues thus tendered, a trial was had, and the
court, after hearing the evidence, made and filed its find-
ings of fact and conclusions of law, and entered its decree
denying to plaintiffs the relief prayed for in the complaint
and dismissing the action.

The court, so far as material here, found: (1) That
neither Milando Pratt nor Louis Le Vine had any written
authority from plaintiffs, or either of them, "for the execu-
tion of said written agreement, and neither of them had
ever been constituted the attorney in fact for the said
respective parties for whom they respectively undertook to
execute said agreement." (2) That at the time the agree-
ment was entered into the stock of the Bingham West Dip
Tunnel Company had no actual market value; but that
neither J. W. nor Ettie Whitehouse knew of the worthless-
ness of the stock; that they relied upon and believed the
statements of Milando Pratt and Louis Le Vine in relation
to the value of the same. (3) That on the 29th day of
January, 1906, the defendants J. W. and Ettie Whitehouse
entered into an agreement with Theodore G. Schulte (code-
fendant), whereby they agreed to sell and Schulte agreed
to purchase, the land in question, together with other lands,
for the sum of $2750, $1200 of which was paid thereon by
Schulte "without any knowledge that plaintiffs were claim-
ing any rights in the property mentioned in plaintiffs'
complaint, but at the time of the payment of the balance
($1550) of said purchase price mentioned in the agreement
of said Schulte with said Whitehouse and wife, on or about
the said 23d day of February, 1906, the said contract or
agreement (between plaintiffs and J. W. and Ettie White-
house) . . . had been placed with the county recorder
of Tooele County, Utah, the same having been recorded

February 21, 1906." The court, in its eighth finding of fact, found "that neither the said Louis Le Vine nor Milando Pratt, either as agents or attorneys for their respective wives or otherwise, did agree with the said Whitehouse and wife, or either of them, to rescind the said agreement mentioned, . . . nor authorized the said Whitehouse and his wife to resell said lands." This finding is contrary to the allegations of the answer and the contentions made by the defendants on this appeal. No cross-asignment of error was filed by respondents (defendants) ; therefore no question on that issue is presented for review by this appeal. We would not refer to the question at all were it not for the fact that counsel for respondents have somewhat elaborately discussed this phase of the case in their printed brief.

Appellants have asigned numerous errors, all of which in some way challenge the correctness of the findings of fact made and the judgment rendered by the court. The questions presented by the assignment of errors relate to and involve the affirmative propositions urged by respondents in support of the judgment, and may be classified as follows: (1) Want of mutuality in the contract. (2) That the contract was not signed by plaintiffs in person nor by any one having written authority from them to sign it. (3) That the respondents J. W. and Ettie Whitehouse were induced to enter into the contract through fraudulent representations of Milando Pratt and Louis Le Vine respecting the value of the 1400 shares of stock which wase accepted by the Whitehouses in lieu of $700 in cash, and that this alleged "inequitable conduct" on the part of plaintiffs' agents rendered the contract "unfair, unjust, and wholly inequitable." (4) Tht time was of the essence of the contract and that plaintiffs, in failing to pay the taxes on the land covered by the contract, amounting to $4.40, which became delinquent November 15, 1905, forfeited their right to a specific performance of the contract. (5) That defendant Schulte was a *bona fide* purchaser of the land in question, and for that reason specific performance should not be de-

creed. (6) That whatever tender was made by plaintiffs of the balance of the purchase price of the land prior to and at the trial of the cause was not kept good by paying the money into court.

We will consider and briefly discuss the questions involved in the order in which we have stated them.

The contract, among other things, provided that if the vendees, appellants, should fail to make any of the payments therein mentioned for a period of sixty days after the same became due, then the vendors, respondents, would be "released from all obligations to convey the property," and appellants would "forfeit all right thereto and to any money paid by them under the agreement." It will therefore be readily observed that the contract is not lacking in mutuality of obligation. But counsel for respondents claim, if we correctly undestand their position, that under the contract there is no mutuality of remedy, for the reason that it was not signed by appellants in person nor by any one who had written authority from them to sign it, and that therefore it could not be specifically enforced against them. It is further urged that, as the contract by its terms was not to be performed within a year, it was void under section 2467, Comp. Laws 1907, which, so far as material here, is as follows: "In the following cases every agreement shall be void, unless such agreement, or some note or memorandum thereof, be in writing and subscribed by the party to be charged therewith: (1) Every agreement that by its terms is not to be performed within one year from the making thereof." These alleged infirmities of the contract, which, to some extent, involve the construction of section 2463, Comp. Laws 1907, we will consider together, as they present practically the same question of law. Section 2463, Comp. Laws 1907, provides that "every contract for the leasing for a longer period than one year, or for the sale of any lands, or interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing and subscribed by the party by whom the lease or sale is to be made, or by his lawful

agent thereunto authorized in writing." From the reading of the foregoing sections of the statute, it will be seen that it is only necessary that some note or memorandum be made of the contract and signed in the one case, by the party "by whom the sale is to be made" and, in the other, by the party "to be charged therewith." The authorities almost uniformly hold that contracts of this kind, to be binding, and enforceable, need be signed by the vendor only, and that specific performance will not be denied for lack of mutuality because not signed by the vendee. In 6 Pomeroy's Equity Jurisprudence (volume 2, Equitable Remedies) section 770, the author says:

"Where a contract for the sale of lands is signed only by the defendant, it is clear that the plaintiff need never have performed his agreement. There was a clear lack of mutuality in the terms. Yet it was clearly held that the contract could be enforced against the party who had signed. The cases all agree upon the point. The filing of the bill made the *remedy* mutual."

The same author, in his work on Specific Performance (section 75), says:

"It may, perhaps, be sustained upon the following grounds: The statute of frauds does not reach the substance of contracts and render them invalid or valid; it simply furnishes a rule of evidence. Whenever, therefore, any agreement is enforced against a defendant who has signed it by a plaintiff who has not, it cannot be said that the agreement, so far as it purports to bind the plaintiff, is a nullity. In a suit against him the statute does no more than require a certain kind of proof, in case he avails himself of it as a defense. The defense, however, is wholly a personal one; and, if he neglects to set it up, the agreement would be established against him notwithstanding the statute. For these reasons, it cannot be said that a memorandum signed by one party alone is so completely wanting in mutuality that no action upon it can be sustained."

See also, 29 Am. and Eng. Ency. Law (2 Ed.), 858; 3 Parsons on Contracts, sec. 9.

In a note to the case of *Ullsperger v. Meyer* (217 Ill. 262, 75 N. E. 482, 2 L. R. A. [N. S.] 221), reported in 3 Am. and Eng. Ann. Cas., the compiler has, beginning on page 1036, collected and reviewed cases from nearly all the states, as well as many English cases, and in the course of his review and discussion of the cases he says:

"The memorandum prescribed by the statute of frauds is usually required by the statute to be signed by the 'party to be charged' or by 'parties to be charged.' In either case by the great weight of authority the quoted words are held to refer, not to the party or parties 'charged' with the contract, but to the party or parties 'charged' in the action; that is, the defendant or defendants. And the fact that the plaintiff has not signed the memorandum does not affect his right to maintain the action."

And again, beginning near the bottom of page 1037, he says:

"By the great weight of authority a verbal acceptance of a written offer to sell or to buy property is sufficient to constitute a complete and obligatory agreement on which to charge the person by whom the offer is signed. In such case, if the memorandum is otherwise sufficient, when it is assented to by him to whom the proposal has been made, the contract is consummated by the meeting of the minds of the two parties, and the evidence necessary to render it valid and capable of enforcement is supplied by the signature of the party sought to be charged to the offer to sell or buy."

A further discussion of this question will be found in a note to the case of *Bailey · v. Leishman* (32 Utah, 132, 89 Pac. 78), reported in 13 Am. and Eng. Ann. Cas. 1121. In 2 Page on Contracts, section 691, the author says:

"The statute does not require the contract, note, or memorandum to be signed by both parties, but only by the party to be charged therewith. . . . Accordingly, a contract, note, or memorandum is sufficient if signed by the party to be charged therewith, though not signed by the party seeking to enforce it. Thus a memorandum of a contract to convey land, signed by the vendor alone, . . . may be enforced by the promisee."

The contract in this case, however, was signed by the duly authorized agents of appellants. True, the authority of the agents was not in writing; but this does not invalidate the contract, there being no statute in this state, at the time the agreement was entered into, requiring an agent's authority to purchase land to be in writing. In 29 A. and E. Ency. Law (2d Ed.) 861, it is said:

"The general rule is that parol authority is sufficient to enable an agent to make a contract for the sale of personal or real property.

But, as regards real property, the contrary doctrine is upheld by many decisions, based usually upon a statutory requirement to that effect."

See also, 2 A. & E. Ency. L. & Pr. 809.

In Pomeroy on Specific Performance, section 79, the author says:

"Contracts, however, relating to real estate, as for sale, letting, and the like, need not be under seal, and the rule is settled that the authority of an agent to enter into such agreements may be given by parol, and may, therefore, be implied from acts and circumstances; unless, as is the case in certain states, the authority to make such contracts is required by statute to be in writing."

As we have observed, at the time the agreement in question was entered into, there was no statute of this state requiring the agent's authority to contract for the purchase of real estate to be in writing, therefore this case does not fall within the exception to the general rule mentioned in the foregoing authorities. We are clearly of the opinion that the contract is not open to the objections urged against it by the respondents.

The next question for consideration is the alleged misrepresentations of Milando Pratt and Louis Le Vine to the defendants J. W. and Ettie Whitehouse respecting the value of the 1400 shares of stock received by the Whitehouses in part payment of the land covered by the contract. Respondents contend that these alleged misrepresentations rendered the contract "unfair, unjust, and inequitable." The record discloses that Le Vine, at the time he negotiated with Whitehouse for the purchase of the land, represented the stock to be worth fifty cents per share, and stated that none had been sold for less than that sum. The record, however, also shows that Whitehouse must have known that the stock had only a speculative value; and, according to his own testimony, he discovered about a month after the agreement was entered into that the stock had no actual or market value, and that he thereafter, without protest, continued to accept payments (aggregating $600) on the contract until the 8th day of November, eleven months after he learned that the stock was practically without value. In fact, the first in-

formation the plaintiffs had that the Whitehouses intended
to base their recission of the contract on the ground of the
alleged misrepresentations made to them respecting the value
of the stock, so far as shown by the record, was when they
filed their amended answer, March 12, 1907, nearly two
and one-half years after they discovered the fraud which
they claim was practiced upon them. Furthermore, the rec-
ord conclusively shows that these alleged misrepresentations
had nothing whatever to do with the refusal and failure
of the Whitehouses to perform their part of the contract,
and that this defense, so far as appears from the record,
never occurred to them for more than a year after they had
announced that they did not intend to live up to the contract.
The defense mainly relied on by them at the trial was that
Le Vine had refused to make any further payments on
the contract and had requested the defendant J. W. White-
house to sell the land to other parties and refund to him the
money which he had paid on the contract, and that he
(Whitehouse), in pursuance of this request from Le Vine,
sold the land to defendant Schulte. But, as we observed in
our statement of the case, the court found against the de-
fendants on this issue. The rule is that, where a
party has been induced to enter into a contract by          **5, 6**
false and fraudulent representations, he may, upon
discovery of the fraud, rescind the contract; but the great
weight of authority holds that, if the party defrauded con-
tinues to receive benefits under the contract after he has
become aware of the fraud, he will be deemed to have af-
firmed the contract and waived his right to rescind. In 9
Cyc. 436, the rule is tersely, and, as we think, correctly,
stated as follows:

"The party defrauded will generally lose his right to rescind if he
takes any benefit under the contract or does any other act which im-
plies an intention to abide by it or an affirmance of it after he has
become aware of the fraud."

Many cases are cited in the footnote in support of this
doctrine. Mr. Pomeroy, in his work on Specific Perform-
ance (Section 222) states the rule as follows:

"In accordance with this principle, if the party to whom a misrepresentation has been made, after having ascertained the real facts of the case, and thus discovered the untruth of the statements, goes on acting in pursuance of the contract, treats the property acquired under it as his own, or otherwise conducts himself with respect to it as though it were a subsisting and binding engagement, he thereby waives the benefit of the misrepresentations, and cannot allege them as a ground either for rescinding or resisting enforcement of the agreement. In other words, the party who has been misled is required, as soon as he learns the truth and discovers the falsity of the statements on which he relied, with all reasonable diligence to disaffirm the contract, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. The party deceived is not allowed to go on deriving all possible benefit from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to execute."

Tested by this principle, the acts and conduct of the defendants J. W. and Ettie Whitehouse after they learned that the stock had no actual or market value must be held to be a waiver on their part of whatever right, if any, they had to rescind the contract because of the alleged fraudulent representations made to them respecting the value of the stock.

Nor do we think the claim that appellants, because they failed to pay the taxes assessed against the land for the year 1905, breached the contract is tenable. The concluding part of the fourth paragraph of the contract, we think, clearly shows that the payment of the taxes for the year 1905 by plaintiffs was not a condition precedent to their right to demand performance of the contract. The part of the contract to which we refer is as follows: "And the said parties of the first part, on receiving such payments as hereinbefore provided, agree to execute and deliver to said parties of the second part, or their assigns, a good and sufficient deed to said property herein described, the title thereto to be free from all incumbrances (except that the second parties shall pay the taxes for the year 1905.)" We think this clearly indicates that the parties, when the contract was drawn, had in mind that the taxes for 1905 might become delinquent and unpaid when the final payment on the purchase price was made, and that in that event

37 Utah—18

the vendors might convey the property to the vendees subject to an incumbrance for the taxes for 1905.

In the latter part of November, or the first part of December, 1905, respondent J. W. Whitehouse entered into negotiations with J. H. Hurd, attorney at law, Walter A. Cook, and J. B. Taylor for the sale of the land in question and 120 acres of additional land in Tooele county, and on January 29, 1906, entered into a written agreement with one Theodore G. Schulte, one of the respondents herein, by the terms of which Whitehouse, for and in consideration of $2750, agreed to sell and convey to Schulte, and Schulte agreed to purchase, the lands mentioned. At the time of the execution of the agreement, Schulte paid Whitehouse $1200 of the purchase price of the land. On February 7, 1906, J. W. and Ettie Whitehouse executed deeds of conveyance of the lands covered by the agreement last mentioned to Schulte. The deeds were placed in escrow with the understanding that they should be delivered to Schulte on payment by him of the balance of the purchase price, $1250 of which was to be paid on or before August 1, 1906, and the remaining $300 on or before October 1, 1906. It is admitted that Schulte had no personal or pecuniary interest whatever in these transactions, and that he acted solely as the agent and trustee of Hurd, Cook & Taylor, who, as partners, manipulated the deal and furnished the money with which to purchase the land. On February 23, 1906, Hurd, Cook & Taylor paid the balance of the purchase price of the land less a small discount, and the deeds thereto were delivered to Schulte, who, on February 26, 1906, had them duly recorded in the office of the county recorder of Tooele County.

As we have observed in the foregoing statement of the case, the trial court, in the seventh finding of fact, found that the agreement last mentioned was made by Schulte as trustee for Hurd, Cook & Taylor, "in entire good faith, and the sum of $1200 paid without any knowledge that said plaintiffs were claiming any right in the property mentioned in plaintiffs' complaint." Appellants contend that this finding was erroneous for the reason that Hurd, Cook & Taylor were in

possession of sufficient facts respecting appellants' interests in that portion of the land (200 acres) covered by their contract with the Whitehouses to put them upon inquiry before they paid any part of the purchase price on the contract entered into by defendant Schulte. Cook and Hurd, who, as we have observed, were members of the partnership for which Schulte acted when he contracted for the purchase of the land, were called as witnesses for the defendants, and Cook testified, in part, as follows: "At the time the negotiations were first taken up with me about buying this land, Whitehouse told me that there had been some kind of a deal on between him and Le Vine. That conversation took place in Salt Lake City about the latter part of November, or the first of December, 1905. He said Le Vine was sick of his proposition, and he was going to throw it up and he wanted his money back. . . .He did not tell me anything about the character of the proposition of Mr. Le Vine. We didn't go into details, not at that time. At another meeting, . . . I think it was on Sunday, January 24, 1906, I inquired whether the proposition that Mr. Le Vine had with Mr. Whitehouse was in writing. He said there had been an agreement, but it did not amount to anything because it was all off. I took his word for it and made no further inquiry at that time. . . . At the time I entered into the agreement of January 29th (the Schulte agreement), I knew that I had had these conversations along in January and December. . . . We hadn't entered into any negotiations particularly at that time because I didn't know whether I wanted to buy or not. . . . I asked him to see a copy of the contract. He said he didn't have it, at least he didn't have it with him. On January 14th he told me this, and on January 29th I made an inquiry concerning the contract. At that time I asked Mr. Whitehouse what kind of a contract it was. He said it was an agreement where Mr. Le Vine was purchasing the property, and he said some stock had been paid and some money, but Mr. Le Vine wanted his money back. . . . Mr. Hurd was present on January 14th at the conversation

and took part in the same and was a party to the negotia·
tions. . . . Whitehouse said Le Vine had paid some
money and he (Whitehouse) had taken some stock. I don't
recollect how much he said; somewhere about $700. . . .
Mr. Whitehouse did not tell me why his contract was dead
and no good, any more than Mr. Le Vine was sick of the
thing, and he was not going to buy it, and had refused to
pay the taxes, and wanted his money back, and authorized
him to go ahead and find a purchaser. . . . I took Mr.
Whitehouse's statement in regard to the whole matter of the
contract between him and Le Vine. Of course, I passed it
up to Mr. Hurd. . . . As far as I was concerned, I
never inquired farther. Whitehouse dropped me a line on
the night preceding that he would be in town on January
29th. I think he came to the office and arranged to meet
Mr. Hurd, because I would not talk to a man of that kind
unless my attorney was present. I knew he was coming to
negotiate again about the land of this suit. . . . I
didn't request him to bring the contract in between Le Vine
and himself."

Hurd testified, in part, as follows: "In one of these
conferences the question came up in some way, and White-
house said that Le Vine had a contract for some portion of
this land, but was unable to tell us what portion. . . .
I asked him if the contract was oral or in writing, and he
said, 'Oh, there isn't any contract. It is all off. . . .
Le Vine hasn't got any interest in it at all.' That he had
requested him to sell the property and give him his money
back, what money he had paid. . . . My impression
was, however, that it had been a written contract. . . .
He convinced me that it was nothing, and that it was per-
fectly agreeable to Le Vine to have the sale go on, and that
Le Vine was anxious to get his money back. We took his
word for it. I am the same J. H. Hurd who appears for the
defendant Schulte in this case."

The original answer of defendant Schulte filed in the case
which was prepared by Hurd and duly verified by Schulte,
was admitted in evidence. This answer, among other things,

contains the following allegation: "Defendant alleges that neither he nor, as he is informed and belives, the said Hurd, Taylor, nor Cook had any knowledge that the said plaintiffs, or either of them, had any claim or interest whatever in or to the said property mentioned and described in the plaintiffs' complaint; but, on the contrary, as defendant further alleges, *they and he were expressly informed and believed that one Louis Le Vine had theretofore had an agreement with the defendants, J. W. Whitehouse and wife, for the purchase of a portion of the lands embraced within the said agreement executed to this defendant,* but that the said agreement had expired according to the terms thereof, and that the said Le Vine had requested the said J. W. Whitehouse to refund to him such moneys as he had advanced under the said agreement, whatever the same might have been, and that he, the said Le Vine, had no claim whatsoever in or to the said lands or any part of the same." (Italics ours.) It is admitted that, before the balance of the purchase price ($1500) under the Schulte agreement was paid, Hurd and Cook had read the agreement between the appellants and the Whitehouses, and Whitehouse in his testimony on this point, which is not denied said: "Before Schulte, Hurd, and Cook paid the $1500, I advised them that some one else had an interest in the land. That was when the last $1500 was paid. . . . I then told them that some parties were about to bring suit against me on account of the land, but they nevertheless went ahead and concluded the deal and got their deed."

We think the evidence of these three witnesses on this phase of the case, when considered in connection with the allegations of Schulte's original answer hereinbefore referred to, clearly shows that Schulte ws not a *bona fide* purchaser without notice. According to their own version of the transactions in question, Cook and Hurd were in possession of sufficient facts to put an ordinarily prudent person upon inquiry. And it is apparent from the record that if they had, with ordinary diligence, followed the line of inquiry suggested by the information furnished them

by Whitehouse before any part of the purchase price       10
was paid on the Schulte contract, they would have
become fully advised of appellants' equity in the land. This
being so, the great weight of authority holds that they were
charged with the same knowledge respecting appellants'
rights as they would have acquired had they pursued the
investigations suggested by the information imparted to them
by Whitehouse. Mr. Pomeroy, in volume 2, section 597,
of his work on Equity Jurisprudence (3d Ed.), states the
rule as follows:

"If, however, it appears that the party obtains knowledge or in-
formation of such facts, which are sufficient to put a prudent man
upon inquiry, and which are of such a nature that the inquiry, *if
prosecuted with reasonable diligence, would certainly lead to a dis-
covery of the conflicting claim,* then the inference that he acquired the
information constituting actual notice is necessary and absolute; for
this is only another mode of stating that the party was put upon
inquiry, that he made the inquiry and arrived at the truth. Finally,
if it appears that the party has knowledge or information of such
facts sufficient to put a prudent man upon inquiry, and that he wholly
neglects to make any inquiry, or having begun it fails to prosecute
it in a reasonable manner, then also, the inference of actual notice is
necessary and absolute."

True, it is claimed that Hurd and Cook were assured by
Whitehouse that Le Vine had abandoned the contract which
he and Pratt had entered into on behalf of plaintiffs; but
this did not relieve them of the duty of pursuing the inquiry,
and especially so in view of the fact that the record dis-
closes that they had but little, if any, confidence in the in-
tegrity of the man with whom they were negotiating for the
purchase of the land. Cook, in the course of his testimony,
says: "I think he (referring to Whitehouse) came to the
office and arranged to meet Mr. Hurd *because I would not
talk to a man of that kind unless my attorney was present."*
In 2 Pom. Eq. Jur. (3d Ed.) section 601, the author says:

"When, however, the grantor, vendor, or mortgagor admits that his
title was defective or incumbered, or that there was some outstanding
claim upon or equity in the property, or makes any other communi-
cation which, unexplained, would constitute an actual notice, but adds
a further declaration to the effect that such defect has been cured, or

incubrance removed, or claim of equity rescinded and destroyed, the purchaser, according to the weight of authority, is not warranted in accepting and relying upon this explanation or contradiction; the information obtained under such circumstances and from such a source is sufficient to put a prduent man upon an inquiry. The reason of this is plain. The informant is under a strong personal interest to misrepresent or conceal the real facts. While the former branch of his communication is made against his interest, and is therefore more likely to be true, the latter part is in conformity with his personal interest, and is essentially untrustworthy."

See also, *Price v. McDonald,* 1 Md. 403, 54 Am. Dec., 657; 2 Jones on Real Prop. & Conv., sec. 1521.

We are of the opinion that the finding of the court that Schulte was a *bona fide* purchaser without notice is not only unsupported by, but is contrary to, the evidence, and therefore erroneous.

The contention that appellants cannot prevail in this action because they have failed to pay into court the balance due the defendants J. W. and Ettie Whitehouse on the purchase price of the land is without merit. The evidence shows that appellants made a tender of the money when they demanded of the Whitehouss that they execute a deed to the land involved. And in their complaint appellants allege that they are ready and willing to perform their part of the contract. In cases of this kind, where there are reciprocal demands and obligations, and there is anything remaining to be done by the party who obtains a decree of specific performance, which, in good conscience, he ought to do, the court may, and usually does, make the decree conditional that, in case the prevailing party fails to pay the money (where payment is the thing required to be done) into court within a specified time, the petition upon which the relief is granted will be dismissed. In 6 Pom. Eq. Jur. (volume 2, Eq. Rems.) section 809, p. 1332, the author says: "It is enough that he (plaintiff) was ready and willing, and offered, and at the time specified, and even that he is ready and willing at the time of bringing the suit, unless his rights have been lost by laches, and that he offers to perform in his pleading." Appellants, by paying the money into court, would have stopped the running of interest on the deferred payments, and, not having done

so, they will, of course, be required to pay interest on the unpaid balance of the purchase price. In 3 Page on Contracts, section 1428, the rule is stated as follows: "If the contract provides for the payment in money, refusal of tender does not discharge the contract as far as the liability of the principal creditor is concerned, though it stops interest and costs, provided the tender is kept good. To discharge interest, however, the tender must be kept good. If the tender is not kept good, and the debtor makes use of the money tendered by him, after tender is refused, he is liable for interest. (28 A. and E. Ency. L. [2d Ed.] 12.)

The judgment is reversed, with directions to the trial court to set aside its findings of fact heretofore made and filed in the case, and the judgment rendered thereon, and to make findings and enter judgment in favor of plaintiffs for a specific performance of their contract according to the prayer of the complaint and in accordance with the views herein expressed. Costs of this appeal to be taxed against respondents.

STRAUP, C. J., and FRICK, J., concur.