## FRAILEY v. McGARRY.

No. 7312. Decided November 18, 1949. (211 P. 2d 840.)

See 17 C. J. S., Contracts, sec. 271. Fraud in sales contract, right to change remedy after assertion of position as to, see note, 143 A. L. R. 489. See, also, 18 Am Jur. 152

*Elias Hansen,* Salt Lake City, for appellant.

*Cline, Wilson & Cline,* Milford, for respondent.

LATIMER, Justice.

This is an action to rescind a contract for the sale of nine hundred and sixty acres of land located in Beryl Valley in the southern part of the state. The agreement was entered into by and between plaintiff and defendant on the 7th day of December, 1945. The parties will be referred to as they appeared in the court below.

The contract provides that plaintiff is to buy and defendant to sell the land for the sum of $28,800.00, two thousand six hundred dollars of which was received as a down payment. The provision for paying the remaining balance of $26,200.00 is as follows:

"On any and all lands where water well permits are granted and allowing water for any given acerage (sic), said acerage (sic) is to be tilled and cropped. On or before January 1st. being termed the end of each harvest season said buyer is to pay to said seller, the sum of Ten Dollars per acre cash and in addition thereto five per cent (5%) interest on all deferred (sic) payments on each and every acre tilled and cropped, until this full purchase price together with interest has been paid. The above given $2,600.00 cash payment

receipted herein is to be credited on the next payment which becomes due and payable on or before January 1st. 1947."

A further provision of the contract material to the case is:

"It is agreed that in the event the buyer or any assignee shall make application to appropriate water or shall procure a certificate of appropriation to appropriate water or shall procure a certificate to appropriate water from wells located upon the said premises and said buyer or assignee or assignees shall thereafter default in this contract, the seller shall immediately become the assignee of any such application or appropriation and the State Engineer of the State of Utah is hereby authorized to recognize said seller as the assignee of any such application and in the event a certificate of appropriation has issued to the said buyer, the water rights thereunder shall be considered as appurtenant to the said premises and in the event of default, the title thereto shall immediately pass to the seller."

Plaintiff sought to rescind the contract on four theories stated in separate causes of action: (1) that plaintiff was induced to enter into the contract by fraudulent representations made by defendant; (2) that defendant refused to furnish plaintiff an abstract of title to the property upon demand as required in the contract; (3) that the contract is against the public policy of this state and particularly 100-3-8, U. C. A. 1943, in that defendant by the contract is seeking to speculate in the public waters of this state; (4) that the contract is so uncertain as to render it invalid.

Defendant filed general demurrers to all four causes of action which were by the court sustained to all except plaintiff's first cause of action. The court later reinstated the cause of action dealing with the right of plaintiff to rescind because of defendant's speculation in the sale of public waters. Defendant filed his answer and counterclaim in which he denied he had perpetrated any fraud upon the plaintiff. He counterclaimed and sought to have the court declare that plaintiff had breached and abandoned the contract, that the amount paid by plaintiff was forfeited, that he, defendant, be released from all obligations

to convey the premises, and that he be given the right to immediate possession.

The cause was tried to the court without a jury. The trial judge held the contract was subject to rescission because of misrepresentations made by defendant to the plaintiff as to the availability of water for irrigation of the land in dispute, but decreed that defendant would not be required to refund the $2,600.00 received by him under the contract unless the plaintiff and his brother-in-law, J. E. Thompson, would assign and transfer to defendant the rights they have acquired under the applications to appropriate water filed by them in connection with the contract. The court granted plaintiff fifteen days in which to elect whether to transfer to defendant the water rights acquired by himself and Thompson. The court further provided that, should plaintiff elect not to convey the rights obtained then defendant would be released from any obligation to convey the land or refund the down payment and plaintiff's rights under the contract would be forfeited for his breach of covenants.

The plaintiff refused to comply with the conditions imposed and the court thereafter decreed that the contract was not subject to rescission, that plaintiff had defaulted in and breached certain conditions of the contract, and, that all of plaintiff's rights under the contract were lost and forfeited. From the judgment as entered, plaintiff has appealed.

It appears that plaintiff was formerly a resident of Tulelake, California. While there he read certain advertisements published by defendant in 1945 regarding land for sale in the Beryl Valley near Cedar City, Utah. As a result of these advertisements, plaintiff made a trip to Cedar City to learn more about this land. He made several trips into the valley with the defendant and studied charts regarding the rating of the land. The parties discussed the availability of water with which to irrigate land in the

valley. Plaintiff testified that defendant informed him there was an abundance of water flowing into a large underground lake under the valley; that there had never been any trouble obtaining plenty of water for irrigation; and, that it was a mere formality to acquire such water, the only requirement being, to apply to the State Engineer for permission to drill and after the applications had been advertised for thirty to sixty days, permits would be granted. Plaintiff informed defendant he was interested in acquiring land upon which to raise potatoes, hay and grain and after being assured the land was suitable for such purposes he entered into a contract with defendant to purchase one hundred and sixty acres. He immediately made application for one well. Plaintiff then left for California to secure some heavy machinery he owned in order to farm the land he had purchased. While in California plaintiff received a letter from defendant informing him that he, defendant, could sell plaintiff a better and larger tract of land than the one plaintiff had already purchased. On plaintiff's return to Cedar City, he, with defendant's consent, returned the contract for the one hundred and sixty acres, assigned the water application to defendant and entered into the contract involved in this lawsuit. Immediately thereafter, the plaintiff signed five underground water applications and had his brother-in-law Jerold E. Thompson, sign four more. However, all the land was to be owned by plaintiff and the applications in Thompson's name were to be for plaintiff's benefit and used on plaintiff's land. Plaintiff indicated that Thompson would work for him on a salary and if Thompson cared to purchase some of plaintiff's land in the future, he would have the right to do so and would be given water sufficient to irrigate the land he purchased.

After signing the contract and making the water applications, plaintiff again returned to California. He testified that within a month or so he began hearing rumors that there was not an abundance of water in the valley and he

became worried when his applications were not advertised by the State Engineer as he had been told would be done. He discussed the matter with defendant who advised him it would be best to go to Salt Lake City and contact the State Engineer personally. He followed this advice and learned from the assistant state engineer that the applications would not be approved. The date of this conference is not fixed. On March 2, 1946, he received a letter from the State Engineer informing him that an alarming number of applications for water in the Beryl Valley had been filed in his office within the last few years, and it would be impossible to satisfy them all; that as a result, no applications had been approved by the State Engineer for some time prior to the filing of plaintiff's applications; that none of them would be approved until the engineer had had an opportunity to investigate the water available in the Beryl Valley underground water system; and, that he, the engineer, felt certain plaintiff's applications would not receive favorable consideration for at least a year. Plaintiff testified this news came to him as a terrible shock. On April 10, 1946, the Governor of this state, by proclamation, suspended the right of the public to appropriate surplus or unappropriated waters in the Beryl Valley. On April 21, 1946, plaintiff by letter, requested permission of the State Engineer to drill two of his proposed nine wells. On April 25, 1946, the State Engineer in answer to the letter, indicated that in a recent meeting, the water users of Beryl Valley had expressed their willingness to permit some additional wells to be drilled in the area in order to develop the valley and they were of the opinion that more water could be obtained without seriously impairing existing rights; and that under these conditions, plaintiff could proceed to drill these two wells, but with the understanding that he did so at his own risk and without definite assurance that he would be given a permanent water right.

Thereafter, on May 23rd, 1946, plaintiff sent another letter to the State Engineer asking if he could change the

point of drilling his wells to land some six miles away which he anticipated he would purchase. He also asked whether defendant could prevent him from doing so. In reply to plaintiff's letter, the State Engineer indicated he, the plaintiff, could change his point of diversion under the law unless he had contracted with defendant to turn the applications over to him in case he, the plaintiff, should default. Shortly thereafter, plaintiff contacted an attorney who, by letter, advised the State Engineer, on June 13, 1946, that plaintiff had decided to let the land go back and forfeit the contract but wanted to move the wells off the land before he was in default. The next day, plaintiff filed his change applications with the State Engineer, and on August 9, 1946, his brother-in-law, Thompson, filed change applications on the wells in his name. These were all protested by defendant. It was not until January 15, 1947, that plaintiff gave defendant notice that he intended to rescind.

Plaintiff has relied upon various grounds in claiming the right to rescind the contract. The principal one asserted by him is that he was induced to enter into the contract by reason of fraudulent representations made by defendant. Plaintiff testified that at the time he entered into the contract he was not aware of the legal procedure to be followed in order to secure underground water rights in the State of Utah; that he informed defendant that he, the plaintiff, was only interested in purchasing lands suitable for agricultural purposes and would not purchase lands upon which water was not available for the irrigation and maturing of crops; that notwithstanding plaintiff's statements, defendant, as a real estate salesman, represented to plaintiff that he, the defendant, was familiar with the nature and extent of water available for the irrigation of the land in question; that it would be a mere formality to apply to the State Engineer for irrigation water and in the course of sixty days the plaintiff would be permitted to drill wells for enough water to irrigate the lands here involved; and that by reason of defendant's representations, he entered

into the contract fully believing he would be able to secure water sufficient to irrigate the nine hundred and sixty acres he had purchased.

After reviewing the record of events as they transpired, we find it unnecessary to determine whether defendant, by fraud, induced the plaintiff to enter into the contract. There are facts present in the instant case which preclude plaintiff from rescinding the contract for the reasons he alleges. It is well settled by decisions from this court that a person claiming the right to rescind a contract because of misrepresentations or fraud, must, after discovery of the fraud, announce his purpose and adhere to it. *Taylor* v. *Moore*, 87 Utah 493, 51 P. 2d 222. We have also held that the purchaser must evidence his intent to rescind by some unequivocal act either by notice or some act amounting to notice of intent to rescind. *McKellar Real Estate & Investment Co.* v. *Paxton*, 62 Utah 97, 218 P. 128. Moreover, a defrauded party, after learning the truth will not be permitted to go on deriving benefits from the transaction and later elect to rescind. *Le Vine* v. *Whitehouse*, 37 Utah 260, 109 P. 2, Ann. Cas. 1912C, 407. Nor will he be permitted to go on with the contract for the purpose of securing benefits which although not directly conferred by the contract, are nevertheless made possible as a result of the contract, only to later claim a right to rescind when he discovers the benefits to be acquired will not be great enough to compensate him for the loss he will sustain by reason of the fraud.

The fraud alleged by plaintiff as grounds for rescission consisted of the alleged statements made by defendant that there was ample water available to irrigate the 960 acres covered in the contract and that it was a mere formality to secure the right to drill wells in order to obtain that water. The falsity of such statements, if made, was made known to the defendant many months before he decided to rescind the contract. He became aware of the fact that there was a supposed shortage of water

and that it would be more than a mere formality to secure permission to drill his wells when he received his first disappointing letter from the State Engineer on March 2, 1946. Yet he did not notify defendant of his intention to rescind until some 10 months later. Black in his work on Rescission and Cancellation, Sec. 536 states the law to be:

"* * * It must be remembered that a contract induced by fraud, false representations, mistake, etc., is not void but only voidable, and it is entirely within the right of the injured party to affirm it or treat it as valid and subsisting. In this respect he has a choice or election, and he should not be required to make his decision instantly. The true doctrine is that, after discovering the facts justifying rescission, the party is entitled to a reasonable time in which to decide upon the course he will take. But this does not mean that he will be indulged in a vacillating or hesitating course of conduct, but that he must act with such a measure of promptness as can fairly be called 'reasonable' with reference to all the circumstances of the particular case. Particularly, he must, if possible, avoid such a delay as will make the ensuing rescission injurious to the other party or to the intervening interests of third persons. He must use reasonable diligence in ascertaining the facts which may entitle him to rescind, and must act so soon after the discovery of them as that the opposite party will not be unnecessarily prejudiced by the delay. The rule is that he who would rescind the contract must offer to do so promptly on discovering the facts that will justify a rescission, and while he is able of himself, or by the judgment of the court, to place the opposite party substantially in statu quo.' "

Plaintiff had little or no cause for an extended delay in rescinding as he does not claim he was subsequently led to believe that he would be able to secure water sufficient to irrigate 960 acres or any substantial part thereof. Even when he received permission to drill two wells at his own risk, he could not possibly have thought they would be sufficient to irrigate the entire tract. As a matter of fact, he attempted to induce defendant to reduce the number of acres he would be required to purchase under the contract when it became apparent to him that it would be difficult if not impossible to secure enough water for his purposes. For almost a year plaintiff vacilated between reliance on the contract, obtaining a modified contract, abandonment

of the contract and finally rescission. When he finally concluded to adopt the latter course, he still maintained his right to retain the benefits he received under the contract.

In attempting to justify his delay in electing to rescind the contract, plaintiff argues this is not a case which permits a party to readily ascertain whether there is sufficient water available to supply the needs of the land which plaintiff sought to purchase. While we agree that the situation in which plaintiff found himself prevented him from being able to tell how much, if any, water he would eventually be given, we think the record is clear that he was informed early in 1946 that in all probability he would not get any water for at least one year and that he never would secure enough water to irrigate 960 acres or any acreage approximating that amount. No good reason appears to justify a delay of some ten months time.

Plaintiff further contends that his acts and conduct after he learned he would not be able to secure the water he needed, made it clear to defendant that he, the plaintiff, did not intend to be bound by the contract. We do not so interpret them. There is a difference between an expression of dissatisfaction and one of intent to rescind. While the record contains evidence of the fact that defendant was dissatisfied with the contract, we are convinced that plaintiff's conduct was insufficient to convey to the defendant the impression that plaintiff was electing to rescind the contract. Plaintiff admitted that he did not make up his mind to rescind until September, 1946, some six months after he was informed he would never obtain the water he would need to irrigate the land. He apparently wanted to keep the contract in good standing until the water rights were transferred to other lands and his attorney and agent, in substance and effect so informed the State Engineer. At that time, plaintiff was not considering rescission; he was contemplating abandonment. If, the day before plaintiff gave defendant written notice he was rescinding the contract, he had found the contract advantag-

eous in spite of his original disappointment, he could have enforced the contract. An expression of great disappointment may suggest some subsequent legal action but not necessarily rescission. Moreover, long after the expression of disappointment plaintiff was seeking to realize benefits from the contract. Subsequent to being informed he would, in all probability, never receive water sufficient to irrigate 960 acres, plaintiff continued his efforts to secure some of the water for which he had applied. After permission to drill two wells was granted he asked the defendant to reduce the acreage and failing in this he asked the State Engineer to allow him to change the points of diversion and use to land obtained or to be obtained from other parties. Plaintiff could not have secured water rights in the valley without having land upon which to use it and after having used the contract to obtain the rights he could not get permission from the State Engineer to change his point of diversion or use so long as defendant claimed an interest in the contract. Plaintiff founded his claim to water in that valley on his interest in the contract and he relied on the contract all of the time he was attempting to deal with the state engineer to change the use and point of diversion. While prior to the Governor's proclamation, plaintiff might have used other land as the basis for applications for water, the fact remains that he continued to use the contract in question for his own benefit until he fully realized his rights to deal with the applications were being defeated by the contract. He cannot claim an interest in a contract under these circumstances and upon failure to benefit himself then claim the right to rescind.

The plaintiff next contends that under 100-3-8, U. C. A. 1943, the contract is against the public policy of this state and that the court therefore erred in striking plaintiff's third cause of action. This cause of action was reinstated so the problem is whether the court erred in not holding the contract void because inimical to public welfare. The portion of that statute to which we have been referred by counsel provides as follows:

"It shall be the duty of the state engineer, upon the payment of the approval fee, to approve an application if * * * 4. The applicant has the financial ability to complete the proposed works and the application was filed in good faith and not for purposes of speculation or monopoly."

We accept the trial court's finding that at the time of the sale the land was worth $1.50 per acre without water and $30.00 per acre with water sufficient to irrigate it. Referring back to the terms of the contract it will be observed that the necessity, the right and the expense of making application for the appropriation of water was to be vested in and assumed by the plaintiff. Also, that should the plaintiff default in the contract defendant would become the assignee of any water rights which might be acquired by the plaintiff. Plaintiff argues that under the contract defendant is to receive a profit of $27,360.00 if and when the plaintiff, at his sole expense, made application to appropriate water or procured a certificate to appropriate water from wells located on the property and that the contract so construed clearly evinces planned speculation in the public waters of this state.

We do not so view the contract. There can be no doubt concerning the duty of this court to invalidate contracts which have a tendency to be injurious to the public welfare. It is equally clear that speculation in the public waters of this state is against the best interests of its people. Although the legislature has given formal expression to this principle, the principle would be equally true in the absence of statute. While contract obligations in contravention of public policy may ordinarily be avoided by the contracting parties, the law favors the right of men of full age and competent understanding to contract freely and before this right is denied on the grounds of public policy, there must be a showing free from doubt that the contract is against public policy and not merely one that has turned out unfortunately for one party or one that was imprudently made. If by any reasonable construction the

contract can be declared lawful and not in contravention of public welfare, it is our duty to so interpret it.

The provision of the statute upon which plaintiff relies places a duty on the State Engineer to approve an application for water if filed in good faith and not for the purpose of speculation and monopoly. Leaving aside the fact that the State Engineer approved three of plaintiff's applications, which would inferentially suggest no violation of the section, we are unable to follow plaintiff's theory that defendant is the speculator. Neither party is seeking to enforce the terms of the contract. Plaintiff is seeking rescission and defendant is seeking forfeiture. Defendant's only right to the use of the water or to any filings does not come into existence unless plaintiff defaults in his contract. Plaintiff's complaint seems to be that he could, in good faith, obtain the water for use on the land but that if he were to default, the water obtained in good faith, could not revert to the seller because he, the seller, would then be speculating in water or obtaining a monopoly. If plaintiff could acquire the right to use all of the water and such use would not create a monopoly in his hands, it would not create a monopoly in the hands of the defendant. Likewise, if the plaintiff was not obtaining the water for speculative purposes then the defendant could not be charged with obtaining the water for such purposes. Rather than construing the contract as being contrary to public policy we construe it to be a contract which permits the plaintiff to add improvements to the land he is purchasing and in the event he defaults, the improvements so constructed revert to the seller. In so construing the contract, we do not wish to be understood as touching on the question of the reasonableness and fairness of the terms imposed.

Plaintiff next contends the court erred in granting defendant's motion to strike the second cause of action in which plaintiff founded his right to rescind upon defendant's failure and refusal to furnish plaintiff with an abstract of title, notwithstanding plaintiff's demand for such

abstract. The provision of the contract relied upon by plaintiff in this connection is as follows:

"The Seller on receiving the payments herein reserved to be paid at the times and in the manner above mentioned agrees to execute and deliver to the Buyer or assigns, a good and sufficient warranty deed conveying the title to the above described premises free and clear of all encumbrances except as herein mentioned and except as may have accrued by or through the acts or neglect of the Buyer, and to furnish at his expense, an abstract or a policy of title insurance, at the option of the Seller, brought to date at time of sale or at time of delivery of deed at the option of Buyer."

Defendant's duty under this clause of the contract was to furnish, at his expense, an abstract or policy of title insurance (at his option) at the time of sale or at the time of delivery of the deed (at the option of the plaintiff). According to plaintiff's testimony, he was not certain whether he requested defendant to furnish an abstract or deliver a deed. Furthermore, while he claimed to have made a written demand the contents of this writing and the date of sending were never disclosed. Such an uncertain showing would not justify a court in entering a decree rescinding a contract for failure of the other party to comply with the demand.

Plaintiff next complains that the court erred in awarding defendant relief under his counterclaim and particularly in adjudging that plaintiff had defaulted in the contract; that the contract was forfeited and terminated and that all rights of the plaintiff in and to all of the property therein described were lost, cancelled, forfeited and terminated. The record discloses that plaintiff admitted not having paid the taxes and not having tilled or cultivated any of the land. The failure to pay taxes constituted a breach of the contract and this, together with the acts and conduct of plaintiff in refusing to proceed with drilling a well, in attempting to change the points of diversion, and in notifying the defendant he had rescinded and would not comply with the conditions of the contract

justified the court in declaring that the rights plaintiff acquired under the contract were forfeited. The decree is appropriate insofar as plaintiff is involved and we need not concern ourselves with the rights of persons not parties in this suit. While some of the applications for water were filed in the name of Thompson the record shows plaintiff to be the. true owner and that Thompson was selected as a convenient applicant to avoid close scrutiny by the State Engineer.

We have reviewed the other errors assigned by plaintiff and find them without substantial merit. The judgment of the lower court is therefore affirmed. Costs to respondent.

PRATT, C. J., and WADE and McDONOUGH, JJ., concur.

WOLFE, Justice.

I concur.

Assuming for the case that McGarry's representations were actionable misrepresentations, which I doubt, I think that some or perhaps most of Frailey's efforts set out in the opinion were legitimate and reasonable efforts to get himself out of a bad situation into which McGarry's representations had induced him to enter. They would take time to work out. In such a case as this what is a reasonable time to decide and announce the intent to rescind may be considerably longer than in the case where the contract presents a simple matter for extrication. And even Frailey's inquiries into the possibilities of obtaining a change in the point of diversion and point of use of the water applied for with an intent to desert the contract may be in line with an exploration into means of retiring with as little loss as possible from a bad situation brought about by the supposed misrepresentation of McGarry. But the total time taken from March 2, 1946 (when Frailey was informed that there was insufficient water in the basin

to supply all prior applications), until January 15, 1947, in electing to rescind the contract is longer than a reasonable time to elect to rescind, in view of the fact that he knew in March, 1946, that there was insufficient water and in June, 1946, that he could not transfer the water he had applied for because he would then not be in position to restore McGarry's rights. As I understand the prevailing opinion, it is not in any way contrary to this view that considerable time might be accorded to exercise an election to rescind in cases such as this where the grounds of rescission may not be so clear and where the election may depend upon reducing to a reasonable certainty some of the contingencies which may be in the path of rescission. I understand the opinion desires to lay before the reader the panorama of events stretching between the making of the contract in December of 1945, and the actual announced election to rescind which occurred on January 15, 1947, in order to present the entire picture of hesitation and vacillation rather than to bear down on any or all of the various events in the panorama as indicative of showing that the "point of no return" had been passed, and that the over-all picture reveals a stretch of time beyond what the law would consider reasonable in this case to unequivocally elect to rescind and to notify McGarry of such election.

As to the question of McGarry's speculation in water rights or his efforts to obtain a monopoly in water as meant by the statute, I concede that the record does not disclose such as far as this case is concerned. I think the place to head off speculation in water or a tendency to gain a monopoly in a water source must be in the Engineer's office.

I am not sure that I can fully concur in the test that if in this case it could not be said that Frailey was speculating in water, it could not be said that McGarry was doing so. They may stand on different levels insofar as their opportunity or potentialities for speculation or monopoly are concerned. But I am not prepared to say that in this case there is evidence that McGarry's enterprise involved or was directed to speculation or the obtaining of a monopoly.