Richard B. BULLOCK, Plaintiff
and Appellant,

v.

STATE of Utah, DEPARTMENT OF TRANSPORTATION; Eugene H. Findlay; Craig Zwick; P.K. Mohanty; Dean W. Holbrook; Alan W. Deardon; J. Vance Beatty; Faye B. Beatty; Estate of Reed A. Bullock, deceased; personal representative of Reed A. Bullock, Defendants and Appellees.

No. 971582–CA.

Court of Appeals of Utah.

Oct. 16, 1998.

Kevin V. Olsen, Salt Lake City, for Appellant.

Richard L. Bird, Jr., Richard Bird & Kump, Salt Lake City, for Appellees Beatty and Bullock.

Jan Graham, Atty. Gen., and Nancy L. Kemp, Asst. Atty. Gen., Salt Lake City, for Appellees State, UDOT, Findlay, Zwick, Mohanty, Holbrook, and Deardon.

Before WILKINS, Associate P.J., and BILLINGS and JACKSON, JJ., concur.

## OPINION

BILLINGS, Judge:

Appellant Richard B. Bullock appeals the trial court's dismissal of his suit against the State of Utah Department of Transportation (UDOT) and several individual defendants. We affirm.

## FACTS

Appellant and the individual defendants in this case were partners who owned land in Provo canyon. The Provo canyon property was the sole asset of the partnership. In October 1991, appellant's partners negotiated a contract between the partnership and UDOT to sell the Provo canyon property to the State of Utah. Appellant learned of this contract after it was negotiated but before the sale was finalized. Appellant opposed the sale because he felt it was below market value.

In January 1992, appellant discussed the contemplated sale with a UDOT employee. Appellant told the employee that he believed the sale would be invalid under the partnership agreement unless all of the partners consented to it. Appellant followed up this conversation with a letter to UDOT which indicated his familiarity with the terms of the sale. The letter concluded: "I have not yet received any information from you and would appreciate receiving whatever you are able to provide so hopefully a sale to the State of Utah can be effectuated."

In March 1992, the other partners deeded the Provo canyon property to UDOT in accordance with the 1991 contract of sale. Appellant did not sign the deed. In September 1992, the individual defendants, acting for the partnership, sent appellant a check for $67,198.43. This check was identified as appellant's share of the proceeds from the sale of the Provo canyon property, and it was accompanied by a note totaling the proceeds of the sale and explaining how they had been disbursed among the partners. Appellant endorsed and negotiated the check on September 18, 1992. Appellant did not respond in any other way to his receiving the check and the sales information.

In March 1993, one year after the title transfer and six months after appellant had accepted payment for the sale, he served notice of suit against the State of Utah. In May 1994, appellant filed suit in federal court against UDOT and the individual defendants

and offered to return his share of the sale proceeds. Appellant's federal suit was dismissed in November 1994. In March 1996, appellant filed suit against UDOT and the individual defendants in state court and again tendered a check for his share of the sale proceeds. The state trial court dismissed appellant's claims against the State as untimely. The trial court also dismissed appellant's suit against the individual defendants, concluding appellant had ratified the sale. Appellant now appeals.

## ANALYSIS

I. Did the trial court err in dismissing appellant's claims against UDOT as time-barred under the Utah Governmental Immunity Act?

Appellant argues the trial court erred when it dismissed his claims against the State as time-barred under the Utah Governmental Immunity Act (the Act). *See* Utah Code Ann. §§ 63–30–1 to –38 (1997). The trial court concluded that appellant's claim against the State was a claim involving property under section 63–30–6 of the Act. Section 63–30–6 provides as follows:

Immunity from suit of all governmental entities is waived for the recovery of any property real or personal or for the possession thereof or to quiet title thereto, or to foreclose mortgages or other liens thereon or to determine any adverse claim thereon, or secure any adjudication touching any mortgage or other lien said entity may have or claim on the property involved.

*Id.* § 63–30–6. Claims under section 63–30–6 are subject to the notice and filing requirements of the Act, and must therefore be filed "within one year after the claim arises." *Id.* § 63–30–12. The trial court concluded that appellant's claim was time-barred because he did not file his state suit until well after the one-year limitation.[1]

Appellant argues, however, that his claim involved a contractual obligation under section 63–30–5, which states:

Immunity from suit of all governmental entities is waived as to any contractual obligation. Actions arising out of contractual rights or contractual obligations shall not be subject to the requirements of Sections 63–30–11, 63–30–12, 63–30–13, 63–30–14, 63–30–15, or 63–30–19.

Utah Code Ann. § 63–30–5 (1997). Under this section, "[a]ctions arising out of contractual rights or obligations" are not subject to the section 63–30–12 statute of limitations. *Id.* Consequently, if appellant's claim was a contractual claim under section 60–30–5, it is exempt from the Act's statute of limitations and remains valid. Thus, we must decide whether appellant's claim against the State is a claim for breach of contract under section 63–30–5 or a claim for recovery of property under section 63–30–6.

"[T]he structure of the Utah Governmental Immunity Act ... focuses on the conduct or situation out of which the injury arose, not on the theory of liability crafted by the plaintiff or the type of negligence alleged." *Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1166 (Utah 1993). Numerous Utah cases have established the principle that "[a] plaintiff's claim should be refused when it is drafted in an attempt to "'evade [the Act's] statutory categories by recharacterizing the supposed cause of the injury.'"" *de Villiers v. Utah County*, 882 P.2d 1161, 1166 (Utah Ct.App.1994) (citation omitted).

■ Utah case law does not support appellant's contention that his claim is a cause of action arising out of contract as contemplated in section 63–30–5. Other Utah cases recognizing claims under section 63–30–5 have all dealt with contractual claims in which the State's breach of a contract was the root of the plaintiff's injury. *See, e.g., Farmers New World Life Ins. Co. v. Bountiful City*, 803 P.2d 1241, 1248 (Utah 1990) (holding claimant had section 63–30–5 claim where city breached written right-of-way agreement for

---

1. Because appellant filed an earlier federal suit, section 78–12–40 of the Utah Code allowed him to file his second state suit up to one year after the dismissal of the federal claims. *See* Utah Code Ann. § 78–12–40 (1996). However, appellant also missed this deadline by filing his state suit fifteen months after the dismissal in federal court.

creek easement); *Brown v. Weis,* 871 P.2d 552, 563–65 (Utah Ct.App.1994) (holding State's breach of implied covenant of good faith and fair dealing pursuant to real estate contract was actionable under section 63–30–5); *Neel v. State,* 854 P.2d 581, 583 (Utah Ct.App.1993), *remanded on other grounds,* 889 P.2d 922 (Utah 1995) (holding insured's third party beneficiary suit to recover insurance benefits from State in its capacity as insurer was section 63–30–5 action).

Appellant does not argue, as did the plaintiffs in the above-cited cases, that the State injured him by breaching a contract to which he was a party.[2] Rather, appellant claims that the partnership's sale of the Provo canyon property to UDOT was invalid from its inception because it violated the partnership agreement between himself and the individual defendants. The only breach of contract appellant alleges was his partners' violation of the partnership agreement. The core of appellant's claim against the State is not that the State violated his contractual rights but that the State is in wrongful possession of appellant's property. This claim is properly cognizable under section 63–30–6 as a claim "for the recovery of [real property] . . . or for the possession thereof or to quiet title thereto." We conclude that appellant's claim is subject to the one-year statute of limitations under section 63–30–12, and the trial court correctly dismissed appellant's claim against UDOT.

II. Did the trial court err in dismissing appellant's claims against the individual defendants because appellant had ratified the sale to UDOT?

A. Did appellant ratify the sale to UDOT?

Appellant argues the trial court erroneously concluded that he ratified the sale of the Provo canyon property and thus erred in dismissing his claims against his partners. In reviewing the trial court's conclusion that appellant ratified the contract, we bear in

mind that this is a review of a Motion for Dismissal. Thus we will reverse the trial court if we find that the facts, viewed in the light most favorable to appellant, "argue against the determinations that [appellant] had 'knowledge of all material facts and an intent to ratify'" the contract. *Zions First Nat'l Bank v. Clark Clinic Corp.,* 762 P.2d 1090, 1099–1100 (Utah 1988).

It is well-established under Utah law that "'[s]ubsequent affirmance by a principal of a contract made on his behalf by one who had at the time neither actual nor apparent authority constitutes a ratification, which in general is as effectual as an original authorization.'" *Moses v. Archie McFarland & Son,* 119 Utah 602, 607, 230 P.2d 571, 573 (1951).

> A principal may impliedly or expressly ratify an agreement made by an unauthorized agent. Ratification of an agent's acts relates back to the time the unauthorized act occurred and is sufficient to create the relationship of principal and agent. Ratification is premised upon the knowledge of all material facts and upon an express or implied intention on the part of the principal to ratify.

*Bradshaw v. McBride,* 649 P.2d 74, 78 (Utah 1982); *See W. P. Harlin Constr. Co. v. Continental Bank & Trust Co.,* 23 Utah 2d 422, 427, 464 P.2d 585, 588 (1970).

In *Moses,* the Utah Supreme Court explained the reasoning behind the doctrine of implied ratification:

> Ratification, like original authority, need not be express. Any conduct which indicates assent by the purported principal to become a party to the transaction or which is justifiable only if there is ratification is sufficient. Even silence with full knowledge of the facts may manifest affirmance and thus operate as a ratification. The person with whom the agent dealt will so obviously be deceived by assuming the professed agent was authorized to act as such, that the principal is under a duty to unde-

---

**2.** Appellant does argue that he has a contractual claim against UDOT as the intended third party beneficiary of the 1991 sale contract. However, there is no foundation for such a claim because appellant received his share of the sale proceeds

under the sale contract and has not alleged that either UDOT or his partners violated the contract. Thus, on the facts he himself alleged, appellant's third party beneficiary claim is meritless.

ceive him. *So a purported principal may not be wilfully ignorant, nor may he purposely shut his eyes to means of information within his possession and control and thereby escape ratification "if the circumstances are such that he could reasonably have been expected to dissent unless he were willing to be a party to the transaction."*

*Moses,* 230 P.2d at 573–74 (citation omitted) (emphasis added).

■ In essence, the doctrine of implied ratification protects both a principal's agent and the co-parties to a contract by ensuring that the principal cannot repudiate the contract after the fact if any reasonable person would have concluded from the principal's actions at the time of the transaction that the principal endorsed the contract.

■ However, we will not infer ratification of a contract unless we conclude that the principal knowingly assented to the material terms of the contract. *See Bradshaw,* 649 P.2d at 78. Thus, " 'ratification requires the principal to have knowledge of all material facts and an intent to ratify.' " *Zions First Nat'l Bank,* 762 P.2d at 1098 (citations omitted).

■ Here, the trial court concluded, and we agree, that appellant had sufficient knowledge of the material facts of the sale to enable him to ratify the sale. Appellant knew in October 1991 that his partners were negotiating a sale to UDOT and was aware of the general terms of the sale. In September 1992, appellant was informed of the sale price and the manner in which the sale proceeds were distributed among the partners. Thus, appellant had unequivocal information that the sale had occurred and sufficient material facts about the sale that his ratification of the sale can reasonably be inferred from his actions. *Cf. Kidd v. Maldonado,* 688 P.2d 461, 462 (Utah 1984); *Van Tassell v. Lewis,* 118 Utah 356, 222 P.2d 350 (1950).

The trial court also concluded that appellant ratified the sale by his conduct. "Under some circumstances failure to disaffirm may constitute ratification of the agent's acts." *Zions First Nat'l Bank,* 762 P.2d at 1098 (citations omitted). "Implied [ratification

may arise] under circumstances of acquiescence or where a duty to disaffirm is not promptly exercised." *Lowe v. April Indus., Inc.,* 531 P.2d 1297, 1299 (Utah 1974) (footnote omitted).

> Any conduct which indicates assent ... which is justifiable only if there is ratification is sufficient [to ratify a contract]. Even silence with full knowledge of the facts may manifest affirmance and thus operate as a ratification [when t]he person with whom the agent dealt will so obviously be deceived [by the principal's silence] that the principal is under a duty to undeceive him.

*Moses,* 230 P.2d at 574 (citation omitted). A duty to educate other parties to a contract arises whenever "the circumstances are such that [the principal] could reasonably have been expected to dissent unless he were a willing party to the transaction." *Id.*

■ A principal's retention of the fruits of a contract can also serve as an implied ratification of the contract. As the *Zions First Nat'l Bank* court noted:

> The retention by a purported principal, with knowledge of the facts *and before he has changed his position,* of something which he is not entitled to retain unless an act purported to be done on his account is affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such retention he repudiates the act. Even if he repudiates the act, his retention constitutes an affirmance at the election of the other party to the transaction.

*Zions First Nat'l Bank,* 762 P.2d at 1099 (citation omitted).

■ In this case, appellant had knowledge both of the existence of the contract and of its material terms. Although appellant had voiced objections to the sale before it took place, he had framed his objections to imply that he would consent to a sale if the terms were satisfactory. When the other partners sent him a check for his portion of the proceeds and a note explaining the sale transaction and the disposition of the sale proceeds, appellant endorsed and negotiated the check and took no other action. Appellant made no

objection until one year after the sale, by which time he had held his share of the sale proceeds for over six months. Under these circumstances, appellant "could reasonably be expected to dissent unless he were willing to be a party to the transaction." *Moses,* 230 P.2d at 574. Thus, the only reasonable conclusion the other parties to the transaction could draw from appellant's actions was that appellant had withdrawn his earlier objections to the sale and had ratified the contract.

We conclude that, even under the heightened standard applicable to summary judgment, the undisputed facts, viewed in the light most favorable to appellant, cannot reasonably support appellant's contention that he did not ratify the sale. Consequently, we rule the trial court was correct in finding that appellant had ratified the contract.

B. Did appellant's ratification release his partners from liability for violating the partnership agreement?

██ Finally, appellant argues even if he ratified the sale with respect to UDOT, his ratification was insufficient to release his partners from liability for their own breach of the partnership agreement. Appellant argues that his partners remain liable to him for damages because he was obligated to ratify his partners' act in order to protect his own interest and because his partners secured his ratification by means of duress and misrepresentation. Appellant cites *Kidd v. Maldonado,* 688 P.2d 461 (Utah 1984), to support his position. However, in *Maldonado,* the supreme court concluded that an agent who had violated his fiduciary duty to the principal was not liable to his principal because the principal failed to contest the agent's actions after they were brought to his attention, thereby implicitly ratifying them. *See Maldonado,* 688 P.2d at 462. The *Maldonado* court stated that "[w]hen a principal sees an act done by his agent and the act is not subject to misunderstanding by a reasonable person, the law does not permit the principal to ignore what is obvious, even if it be contrary to his instructions." *Id.* Thus the *Maldonado* court concluded, as we do in this case, that the principal's acquiescence in

unauthorized acts *once he had reason to know about them,* constituted a ratification sufficient to release the agent from liability. *See id.*

## CONCLUSION

We conclude that appellant's claim against the State is a claim for recovery of property and is therefore time-barred under Utah Code Ann. § 63–30–12 (1997). We also conclude that by accepting his portion of the sale proceeds and by failing to disaffirm the sale for over six months, appellant implicitly ratified the sale contract. This ratification validated the sale of the Provo canyon property to UDOT and released appellant's partners from liability for their violation of the partnership agreement. We therefore hold that the trial court correctly dismissed appellant's claims against the State and the individual defendants.

WILKINS, Associate P.J., and JACKSON, J., concur.

**STATE of Utah, Plaintiff and Appellee,**

v.

**Brenda F. ELLINGSWORTH, Defendant and Appellant.**

**No. 971456–CA.**

Court of Appeals of Utah.

Oct. 16, 1998.

Robert K. Heineman and Vernice S. Ah Ching, Salt Lake Legal Defender Ass'n, Salt Lake City, for Appellant.

Jan Graham, Atty. Gen., Kris C. Leonard and David Gardner, Asst. Attys. Gen., Salt Lake City, for Appellee.

Dennis V. Lloyd, Teresa J. Mareck, and Paul G. Cassell, Salt Lake City, for Amicus Curiae Workers Compensation Fund.

Before BILLINGS, GREENWOOD and ORME, JJ.

## OPINION

BILLINGS, Judge:

Defendant Brenda Ellingsworth appeals her conviction for Workers' Compensation Fraud, a third degree felony in violation of Utah Code Ann. § 35-1-109 (1994). Specifically, defendant argues the trial court erred in denying her Motion to Suppress medical records. We affirm.

## FACTS

Defendant allegedly injured her back in October 1994 while working at Blynco Manufacturing Company. No other employee observed her alleged accident. After defendant's supervisor sent her to St. Mark's hospital for treatment, the supervisor reported

1. *See* Utah Code Ann. §§ 31A–26–101 to 311

the claim to the Workers' Compensation Fund (WCF) and included a letter explaining that she doubted the injury's validity.

A few days later, defendant was injured in a fight with her husband and sought treatment at the same hospital. Defendant later returned to St. Mark's seeking treatment for pain she associated with the Blynco accident. Defendant did not mention the intervening fight with her husband as a potential cause of the pain. She received treatment from a St. Mark's doctor throughout the next year, and the bills were sent to the WCF.

A WCF claims adjustor handled defendant's workers compensation claim. The adjustor's duties included ensuring that claims were compensable, assuring that appropriate medication and treatment were received, and determining when or if the claimants would return to work.[1] While investigating defendant's mounting bills, the WCF adjustor learned that Defendant: had been missing doctor's appointments, had failed to submit the required paperwork, had not returned to work, had received prescriptions for numerous strong narcotics and painkillers, and had been misrepresenting her medical history.

The WCF adjustor sent defendant to an independent medical examiner and met with defendant to clarify her medical history. Defendant's responses to the doctor's and the adjustor's questions led the adjustor to obtain defendant's consent to review her medical records. The WCF adjustor learned that defendant had a lengthy medical history ("several hundred medical records"), and forwarded her medical history to the independent doctor. The doctor, after reviewing the records and examining defendant, opined that defendant's pain was likely unrelated to the Blynco injury.

The WCF adjustor also sent defendant's medical records to WCF's investigation department. A WCF investigator met with defendant in February 1995, and defendant repeatedly denied having any prior or post-Blynco injuries. She also denied having been to the hospital in the past few years except for the Blynco injury. Once the WCF investigator suggested that he knew the ex-

(1994) (Insurance Adjustors).

tent of defendant's past medical history, she admitted being assaulted by her husband and that she had been hospitalized in the past year. After further discussion with defendant, the WCF investigator forwarded her case history to the Utah Attorney General's office pursuant to Utah Code Ann. § 31A–31–104 (1994).[2] Defendant was subsequently prosecuted for Workers' Compensation Fraud. She filed a Motion to Suppress her medical records, which the trial court denied. Defendant was convicted and now appeals.

### ANALYSIS

#### Did the Trial Court Err in Refusing To Suppress Defendant's Medical Records?

Defendant argues the trial court erred when it denied her Motion to Suppress all medical records and all evidence derived from those records. Defendant asserts that the use of her medical records in her criminal trial, gathered initially by the WCF to verify her WCF claims, violated her Fourth Amendment rights. She contends alternatively that the obtaining of her medical records was an unconstitutional seizure which exceeded the scope of her consent, or that her consent was not voluntary. As a necessary precursor to her Fourth Amendment claims, defendant must establish that the seizure of her records by the WCF was "state action" subject to the Fourth Amendment. This is an issue of first impression in Utah.

Defendant argues that the Workers' Compensation Fund is a state actor subject to the Fourth Amendment's strictures. She cites cases holding that a quasi-government corporation is a state actor for purposes of enforcing other federal constitutional restrictions. *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 394, 115 S.Ct. 961, 972–74, 130 L.Ed.2d 902 (1995).[3] Defendant focuses on the wrong issue. We accept for

purposes of our analysis, but do not concede, that the WCF is a state actor. However, this is not dispositive, as our analysis makes clear. The relevant authority under the Fourth Amendment focuses not on whether a state actor is involved, but on whether non-law enforcement government employees' acts are "state action" subject to the Fourth Amendment's strictures.

Recently, in *United States v. Attson,* 900 F.2d 1427, 1429–30 (9th Cir.) (emphasis added), *cert. denied,* 498 U.S. 961, 111 S.Ct. 393, 112 L.Ed.2d 403 (1990), the Ninth Circuit dealt precisely with the issue of when a non-law enforcement government employee's acts are state action subject to the Fourth Amendment. In *Attson,* the defendant was the driver of an automobile involved in a fatal motor vehicle accident. *See id.,* 900 F.2d at 1429. The attending physician and staff were federal employees. *See id.* In the course of treatment, they noticed the scent of alcohol on Attson's breath, and took a blood sample to determine his blood-alcohol level. *See id.* The doctor testified at trial that he directed defendant's blood-alcohol level to be tested for medical reasons, and that the test results were released pursuant to a subpoena from law enforcement officials a year after the accident. *See id.* The defendant unsuccessfully sought to have the blood alcohol test results suppressed, and was eventually convicted of manslaughter.

The Ninth Circuit characterized the issue to be decided as "whether the strictures of the Fourth Amendment apply to the conduct of a government doctor who, for medical reasons, takes a blood sample from a criminal suspect and conducts a blood alcohol analysis on that sample." *Id.* at 1429. In discussing the type of state conduct necessary to implicate the Fourth Amendment, the court stated that

---

**2.** Section 31A–31–104(1)(b) states that "[u]pon written request by an authorized agency to an insurer, the insurer or an agent authorized by the insurer to act on the insurer's behalf shall release to the authorized agency information or evidence that is relevant to any suspected insurance fraud."

**3.** In *Lebron,* the Supreme Court determined that governmental control is the critical inquiry in considering whether an entity is a governmental actor for purposes of the Fourteenth Amendment. However, the question before us is whether the WCF has engaged in "state action" for purposes of the Fourth Amendment, and not whether the WCF is a "state actor." Thus *Lebron* is not helpful.

unlike the "state actor" requirement of the fourteenth amendment, the Fourth Amendment cannot be triggered simply because a person is acting on behalf of the government. Instead, the Fourth Amendment will only apply to governmental conduct that can reasonably be characterized as a "search" or a "seizure."

*Id.* In other words, "[t]he general *Attson* rule is that non-law enforcement government actors come within the purview of the Fourth Amendment only when their searches or seizures of individuals *have no other purpose* but to aid the government's investigatory or administrative functions." *Wallace v. Batavia Sch. Dist. 101,* 68 F.3d 1010, 1013 (7th Cir.1995) (emphasis added).

The *Attson* court stated:

Determining whether the conduct of a non-law enforcement governmental party is subject to the Fourth Amendment presents a question that is analytically quite similar to determining whether the conduct of a private party is subject to the Fourth Amendment. Both of these analyses proceed from the premise that at its core the Fourth Amendment was designed to apply to the conduct of law enforcement officials engaged in criminal investigations and that if the application of the Fourth Amendment is to expand beyond that core, the conduct to which it expands must approximate the types of activities to which the amendment is primarily directed; in other words, such conduct must be considered a "search" or "seizure." In addition, both analyses require us to gauge whether the party whose actions are challenged intended to assist the government in activities ("searches or seizures") covered by the Fourth Amendment, or whether his motivation was independent of such considerations.

. . . .

The intent test formulated in [*United States v. Walther,* 652 F.2d 788, 791–92 (9th Cir.1981)] and used to determine whether a private party is subject to the Fourth Amendment is equally applicable in the context of deciding whether non-law enforcement government employees are subject to the Fourth Amendment. . . . We thus conclude that for the conduct of a governmental party to be subject to the Fourth Amendment, the governmental party engaging in that conduct must have acted with the intent to assist the government in its investigatory or administrative purposes and not for an independent purpose.

In a similar state court decision, *Commonwealth v. Cote,* 15 Mass.App.Ct. 229, 444 N.E.2d 1282 (Mass.App.Ct.1983), the Massachusetts Appeals Court held that observations made by a municipally owned electric company employee were admissible in a criminal trial. The employee was reading electric meters in a private apartment when he discovered an unauthorized unmetered gas line. *See id.* at 1284. Eventually the police were called to the apartment and the apartment manager was cited. *See id.* at 1285. The employee was on the premises pursuant to a statute that provided access to utility personnel for meter reading. *See id.* at 1286. The *Cote* court examined whether the employee was engaged in state action

---

