2008 UT 37

Scott OCKEY and Catherine Condas, Plaintiffs, Appellant, and Cross–Appellee,

v.

John LEHMER; Iron Mountain Alliance, Inc., a Utah corporation; Iron Mountain Holding Group, L.C.; Iron Mountain Associates, L.L.C.; White Pine Associates, LTD; White Pine Associates, Inc.; George Condas; Nick J. Condas; Chris Condas; Ellen Bayas; Alexandra Ockey; John Condas; Susi Kontgis; Marina Condas; Hermione Bayas; Ellen Ockey–Johnson; Keith Kelley; Walt Brett; and Tom Guald, Defendants, Appellees, and Cross–Appellants.

No. 20060142.

Supreme Court of Utah.

June 24, 2008.

Eric P. Lee, Salt Lake City, for appellant.

Troy L. Booher, Matthew L. Lalli, Salt Lake City, for appellee John Lehmer.

Dennis J. Conroy, Spencer C. Siebers, Salt Lake City, for appellee Iron Mountain Alliance, Inc.

PARRISH, Justice:

¶ 1 This case arises from an intrafamilial struggle over the division of profits from the development of a 2700–acre ranch situated between the Park City Mountain Resort and The Canyons Resort in Summit County. Beginning in 1976, the ranch was held in various trusts established by members of the Condas family. Scott Ockey ("Ockey"), one of the beneficiaries of the trusts, alleges that he was wrongly divested of his real property interest in the ranch. He also alleges that he was wrongfully deprived of his interest in a company, Iron Mountain Alliance, Inc. ("IMAI"), that was dedicated to developing portions of the ranch. Ockey filed suit, asserting a claim to quiet title to the ranch and a claim for declaratory relief as to his ownership therein. He also asserted claims of conversion against his cousin John Lehmer ("Lehmer") and IMAI, as well as a claim for breach of fiduciary duty against Lehmer.

¶ 2 The district court dismissed the declaratory relief and quiet title claims and ruled against Ockey as to the conversion and breach of fiduciary duty claims—decisions that Ockey appeals. We affirm.

## BACKGROUND

### I. FACTUAL HISTORY

¶ 3 The parties do not dispute the factual findings of the district court. We therefore recite the facts in accordance with the district court's findings.[1] The ranch property in dispute was originally owned by John Condas, a Summit County rancher, who left an undivided one-sixth interest in the ranch to each of his six children upon his death in 1969. Seven years later, the children, seeking to avoid large estate taxes, conveyed their interests in the ranch to various irrevocable trusts. The trusts named the third generation—John Condas' grandchildren—as beneficiaries.

¶ 4 Scott Ockey, one of those grandchildren, was the named beneficiary under two such trusts. The first trust, settled by his mother, Alexandra Ockey, held an undivided one-twelfth interest in the ranch. The second trust, settled by Ockey's uncle, Nick Condas ("Uncle Nick"), held an undivided one-eighteenth interest in the ranch. This left Ockey as the beneficiary of trusts collectively holding nearly fourteen percent of the ranch property.

¶ 5 Both trusts, the terms of which were nearly identical, indicated that they would terminate upon the beneficiary's twenty-first birthday. Each trust could be extended, however, at the beneficiary's election, until he turned twenty-eight. Upon termination, the corpus of the trusts would pass to the beneficiary.

¶ 6 Beginning as early as 1975, the Condas family sought to capitalize on the ranch's location by developing it. To this end, land-owning family members leased their interests to IMAI, a development company, in May 1989. Lehmer, one of the grandchildren and Ockey's cousin, represented the family in its dealing with IMAI.

¶ 7 In 1993, after defaulting on its lease payments multiple times, IMAI delivered all of its stock to Lehmer in satisfaction of the defaulted payments. At the time Lehmer received the IMAI stock, the sole asset of IMAI was a lease on adjacent state lands that were critical to the future development of the ranch (the "State Lease"). When Lehmer received the IMAI stock, the annual payment on the State Lease was past due, requiring the family to immediately raise funds in order to retain the State Lease. After discussing the issue with some—but not all—family members, Uncle Nick, the "family communicator," instructed Lehmer to cancel the received IMAI stock and reissue new shares that would be sold at $1.00 per share to representatives of each of the six families (the "1993 stock transfers"). This scheme allowed the family to raise $6,000 to make the State Lease payment. In subse-

---

1. *Pack v. Case,* 2001 UT App 232, ¶ 2, 30 P.3d 436.

quent years, similar stock sales provided a way to compensate family members who were willing to invest time or money into developing the ranch.

¶ 8 In 1994, in an effort to facilitate development of the ranch, the family consolidated ownership of the ranch by transferring their interests to a family limited liability company, Iron Mountain Alliance, Ltd., which, in turn, conveyed those interests to Iron Mountain Holding Group ("IMHG"), the entity that would eventually develop the ranch.[2] The transfer was accomplished through a document in which the trustees conveyed the trusts' interests in the ranch to IMHG (the "1994 conveyance"). Sometime prior to the 1994 conveyance, Ockey executed a document directing the trustees to convey his interest in the ranch property in exchange for a partnership interest in IMHG.

¶ 9 Since 1993, the ranch has become part of a successful real estate development. All family members, including Ockey, have enjoyed substantial profits due to their ownership interests in IMHG, and it is anticipated that they will receive more in the future.

## II. PROCEDURAL HISTORY

¶ 10 In 1997, Ockey filed suit against fourteen family members and IMAI.[3] Ockey alleged that the 1993 stock transfers were improper because the IMAI stock should have been split and issued to the legal owners of the ranch, rather than sold to family members willing to buy stock. Accordingly, he brought claims for conversion of his stock and breach of fiduciary duty, as well as other claims arising from the 1993 stock transfers.

¶ 11 Ockey also contests the 1994 conveyance, arguing that it was void because his trusts terminated on his twenty-eighth birthday, eight years before the 1994 conveyance, vesting in him individually both legal and equitable title to his percentage interest in the ranch and leaving the trustees nothing to convey. This is the basis of Ockey's quiet title and declaratory relief claims.

¶ 12 Before trial, various settlements and dismissals narrowed the pool of defendants to Lehmer and IMAI and narrowed Ockey's claims to four causes of action: (1) a declaratory relief claim that the 1994 conveyance was void because Ockey's trust had terminated, vesting ownership in Ockey and divesting the trustees of the authority to act on his behalf; (2) a quiet title claim based on Ockey's interest in the ranch; (3) a conversion claim against Lehmer and IMAI; and (4) a breach of fiduciary duty claim against Lehmer.

¶ 13 In 2000, the district court granted summary judgment against Ockey on the declaratory judgment and quiet title claims, holding that Ockey ratified the 1994 conveyance. In 2002, the district court conducted a trial to consider Ockey's two remaining claims: (1) conversion against Lehmer and IMAI and (2) breach of fiduciary duty against Lehmer. Following trial, the district court dismissed both claims, concluding that the conversion claim was barred by the statute of limitations and that the breach of fiduciary duty claim failed for lack of a remedy.

## ANALYSIS

¶ 14 Although Ockey raises eight issues on appeal, three are dispositive: (1) whether the district court properly concluded that the doctrine of ratification barred Ockey's quiet title and declaratory relief claims arising from the 1994 conveyance, (2) whether the district court properly found that Ockey's conversion claim was barred by the statute of limitations, and (3) whether the district court erred in refusing to fashion an equitable remedy for Ockey's breach of fiduciary duty claim. We affirm the district court on all three issues.

## I. THE 1994 CONVEYANCE WAS VOIDABLE AND RATIFIED BY OCKEY

¶ 15 The district court dismissed Ockey's declaratory relief and quiet title claims on

---

**2.** For simplicity, we will refer to both of the companies as "IMHG."

**3.** Ockey's cousin, Catherine Condas, initially joined this suit but did not appeal. Therefore, we refer only to Ockey's claims in this opinion.

summary judgment, reasoning that Ockey ratified the 1994 conveyance of his interest in the ranch to IMHG, the family-owned holding company created to facilitate developing the ranch property. On appeal, Ockey argues that the 1994 conveyance was void ab initio because his trusts terminated in 1986, on his twenty-eighth birthday, vesting both legal and equitable title in his name and leaving nothing for the trustees to convey in 1994. Because the 1994 conveyance was void ab initio, he argues, it could not be ratified.

¶ 16 The district court's summary dismissal of the quiet title claim presents an issue of law that we review for correctness.[4]

### A. The 1994 Conveyance Was Voidable Because It Harmed Only Ockey and Did Not Violate Public Policy

¶ 17 By their terms, both of Ockey's trusts terminated, at the latest, in 1986, when Ockey turned twenty-eight. Upon termination, the trustees retained only the authority to wind up affairs of the trusts and to transfer the corpus of the trusts, the ranch property, to the beneficiary, Ockey.[5] Ockey is therefore correct in arguing that by the time the trustees purported to convey the trust corpus to IMHG in 1994, they lacked the authority

to do so. The fact that the trustees lacked the authority to execute the 1994 conveyance, however, does not resolve the dispute over ownership of the ranch, however, because it does not address whether the conveyance was void ab initio or merely voidable and therefore capable of ratification.

¶ 18 The distinction between void and voidable is important, although the terms are not always used precisely.[6] A contract or a deed that is void cannot be ratified or accepted,[7] and anyone can attack its validity in court.[8] In contrast, a contract or deed that is voidable may be ratified at the election of the injured party. Once ratified, the voidable contract or deed is deemed valid. A deed that is voidable is valid against the world, including the grantor,[9] because only the injured party has standing to ask the court to set it aside.[10]

¶ 19 In general, the difference between void and voidable contracts is whether they offend public policy. Contracts that offend an individual, such as those arising from fraud, misrepresentation, or mistake, are voidable. Only contracts that offend public policy or harm the public are void ab initio.[11]

---

4. *See Wasatch Crest Ins. Co. v. LWP Claims Adm'rs Corp.*, 2007 UT 32, ¶ 6, 158 P.3d 548.

5. *See* Restatement (Second) of Trusts §§ 344–45 (1959) (stating the general rule that when a trust unambiguously ends on the happening of a certain event, the trust terminates and the trustee retains only the authority to wind up the affairs of the trust or to distribute the property in accordance with the terms of the trust).

6. *See, e.g., Consol. Realty Group v. Sizzling Platter, Inc.*, 930 P.2d 268, 273 n. 7 (Utah Ct.App. 1996) (" 'The term "void," however, as applicable to conveyances or other agreements, has not at all times been used with technical precision, nor restricted to its peculiar and limited sense, as contradistinguished from "voidable" ....' " (quoting *Black's Law Dictionary* 1411 (5th ed. 1979))).

7. *See, e.g., Mut. Benefit Life Ins. Co. v. Winne*, 20 Mont. 20, 49 P. 446, 449 (1897) ("A thing is void which is done against law at the very time of doing it, and where no person is bound by the act; but a thing is voidable which is done by a person who ought not to have done it, but who nevertheless cannot avoid it himself after it is done." (internal quotation marks omitted)).

8. *Wagner v. United States*, 573 F.2d 447, 452 (7th Cir.1978) (" 'Another test of a void act or deed is that every stranger may take advantage of it, but not of a voidable one.' " (quoting *Winne*, 49 P. at 449)).

9. 23 Am.Jur.2d *Deeds* § 162 n. 3 (2002).

10. *See, e.g., Wagner*, 573 F.2d at 452 (" 'Whenever the act done takes effect as to some purposes, and is void as to persons who have an interest in impeaching it, the act is not a nullity, and therefore, in a legal sense, is not utterly void, but merely voidable.' " (quoting *Winne*, 49 P. at 449)); *Baldwin v. Burton*, 850 P.2d 1188, 1193 (Utah 1993) ("[T]he general rule of construction [is] that when an act is void as to persons who have an interest in impeaching it, the act is not utterly void, but merely voidable.").

11. *Fletcher v. Stone*, 20 Mass. (3 Pick.) 250, 252 (1825) ("Acts which affect injuriously the public interest are generally void; and those which affect only private rights are voidable." (citation omitted)); *Black's Law Dictionary* 1604 (8th ed. 2004) ("A contract is void ab initio if it seriously offends law or public policy, in contrast to a contract that is merely voidable at the election of one party to the contract.").

¶ 20 In this case, Ockey asks us to hold that the 1994 conveyance was void because the trustees lacked authority to transfer the ranch property to IMHG after the trusts terminated. We decline, concluding that the 1994 conveyance was merely voidable because the trustee's actions were not contrary to public policy and did not injure anyone other than Ockey himself.

¶ 21 In determining whether the 1994 conveyance was void or voidable, we start with the presumption that contracts are voidable unless they clearly violate public policy. This presumption stems from the general rule that "the law favors the right of men of full age and competent understanding to contract freely." [12] For a contract to be void on the basis of public policy, "there must be a showing free from doubt that the contract is against public policy." [13]

¶ 22 For example, in *Millard County School District v. State Bank of Millard County*, we considered whether a contract was void or voidable. [14] At issue was whether the bank acted in excess of its statutory power by issuing securities that were different from those that the bank was statutorily authorized to issue. Acknowledging that the bank exceeded its authority by issuing the securities, we disagreed that this ultra vires act rendered the securities void. [15] "[B]y the great weight of judicial authority it is well recognized that there is a distinction between an illegal or void contract and one merely ultra vires," which could become enforceable by ratification or estoppel. [16] We explained that only "contracts and corporate acts and transactions which are malum in se or malum

prohibitum, which contravene some rule of public policy, [or] violate some public duty ... are illegal and void." [17] Although the bank had acted in excess of its authority, its action did not violate the general policy of the state so egregiously that the contract was void.

¶ 23 In contrast, in *Zion's Service Corp. v. Danielson*, we found a contract void where the purpose of the contract was to control prices and limit competition between the bids given by masonry contractors. [18] Finding that the contract created an unreasonable restraint on trade, we held it void as against public policy. [19] Two elements were present in *Zion's Service Corp.* that are important to our analysis. First, the legislature had specifically declared that contracts formed to control prices were " 'prohibited and declared unlawful' " and would be " 'absolutely void.' " [20] Second, the contract harmed the public as a whole—not just an individual.

¶ 24 Comparing Ockey's case to these two cases demonstrates that the 1994 conveyance was merely voidable. First, no statute declares ultra vires acts by trustees absolutely void as against public policy. Second, the trustees' actions only affected Ockey—they did not harm the general public. Finally, in light of the freedom to contract, we have a duty to employ "any reasonable construction" to declare contracts "lawful and not in contravention of public welfare." [21]

### B. Ockey Ratified the 1994 Conveyance

¶ 25 Whether we characterize the facts found by the district court in the worst

---

**12.** *Frailey v. McGarry*, 116 Utah 504, 211 P.2d 840, 847 (1949); *see also Phone Directories Co. v. Henderson*, 2000 UT 64, ¶ 15, 8 P.3d 256 ("[P]eople are generally free to bind themselves pursuant to any contract, barring such things as illegality of subject matter or legal incapacity.").

**13.** *Frailey*, 211 P.2d at 847.

**14.** 80 Utah 170, 14 P.2d 967, 971–72 (1932).

**15.** *Id.*

**16.** *Id.* at 971–72 (citation omitted).

**17.** *Id.* at 972; *see also Hatch v. Lucky Bill Mining Co.*, 25 Utah 405, 71 P. 865, 866 (1903) (stating

that corporate actions which are "neither criminal, opposed to good morals, nor against public policy ... are not void, but voidable only; and a stockholder aggrieved thereby may acquiesce in and ratify what has been done, or may disaffirm and repudiate the voidable proceeding").

**18.** 12 Utah 2d 369, 366 P.2d 982, 985–86 (1961).

**19.** *Id.* at 986.

**20.** *Id.* at 985 (quoting Utah Code Ann. §§ 50–1–1, –6 (1953)).

**21.** *Frailey*, 211 P.2d at 847.

light or the best light, Ockey ratified the 1994 conveyance.

¶ 26 Placing the worst gloss on the facts found by the district court, it is possible that the trustees engaged in self-dealing and violated their fiduciary duty to Ockey by failing to transfer the ranch property when the trust terminated. Even if this were the case, the 1994 conveyance would be voidable and ratified by Ockey. According to well-established case law, a trustee's violation of his fiduciary duty is voidable and capable of ratification.[22] "[A]fter a breach of trust has occurred, a beneficiary may expressly or impliedly express satisfaction with the trustee's action and thereby prevent himself from claiming thereafter that it was illegal."[23] As an Illinois court recognized, "a trust beneficiary who consents to or approves of an act, omission, or transaction by a trustee, may upon the ground of waiver or estoppel be precluded from subsequently objecting to the impropriety of such act, omission, or transaction; this rule may arise from acquiescence, request, participation, or notification."[24]

¶ 27 Under this characterization of the facts, Ockey ratified the 1994 conveyance. First, in 1993, before the trust property was conveyed to IMHG, Ockey signed a document directing the trustees to convey his ownership in the ranch property to IMHG in exchange for his partnership interest in IMHG. Second, following the 1994 conveyance, Ockey accepted the benefits stemming from the contract. Consolidating ownership of the ranch in IMHG facilitated the successful development of the ranch. As a result, Ockey has received approximately two million dollars in profits, and he stands to receive more. In 1998, Ockey entered into a settlement agreement with IMHG's successor, promising that the outcome of this litigation would not affect ownership of the ranch. The settlement agreement enabled the ranch development to proceed and allowed Ockey to continue to profit from the development. These two facts demonstrate that Ockey acquiesced in and ratified the 1994 conveyance.[25]

¶ 28 Placing the best gloss on the facts found by the district court, it is possible that when the trust terminated, Uncle Nick's role shifted from acting as a trustee to acting as an agent on behalf of Ockey and the other family members. Of course, actions that exceed the scope of agency are merely voidable, not void, and therefore capable of ratification by the principal.[26]

¶ 29 Ockey ratified the contract under this characterization of the facts as well. Ockey owned his portion of the ranch as a tenant in common with the rest of the family, all of whom were interested in developing it. In order to develop the land, specific actions were necessary. For example, the family needed to make annual payments on the State Lease, contract with developers, and make improvements on the state property.

¶ 30 In light of these responsibilities, it makes sense that an individual within the family would take the lead. The district court found that "in accordance with the family's usual business practice," Uncle Nick took that role by acting as the "family communicator." Between 1969 and 1995, business decisions concerning the development of the ranch "generally followed a common course of dealing." Uncle Nick contacted members of the family, solicited their input, generated a consensus, and acted as the family spokesperson for decisions that were made. During this time, Ockey was "ob-

---

22. *See, e.g., Hallin v. Hallin*, 228 Wis.2d 250, 596 N.W.2d 818 (Ct.App.1999) (holding that a contract made in violation of trustee's fiduciary duty was voidable and ratified by the beneficiary).

23. *Id.* at 824 (internal quotation marks omitted).

24. *Mahle v. First Nat'l Bank of Peoria*, 241 Ill. App.3d 672, 182 Ill.Dec. 691, 610 N.E.2d 115, 117 (1993).

25. *See Bullock v. State*, 966 P.2d 1215, 1219 (Utah Ct.App.1998) ("A principal's retention of the fruits of a contract can also serve as an implied ratification of the contract.").

26. *See, e.g., Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1098 (Utah 1988) ("A principal may impliedly or expressly ratify an agreement made by an unauthorized agent. Ratification of an agent's acts relates back to the time the unauthorized act occurred and is sufficient to create the relationship of principal and agent.... Under some circumstances failure to disaffirm may constitute ratification of the agent's acts.").

sessed" with the ranch and "read everything he could" about it. When Ockey asked Uncle Nick questions about the ranch, Uncle Nick directed him to the relevant records concerning the ranch, which were stored in an office that Ockey and Uncle Nick shared.

¶ 31 As we stated in *Bradshaw v. McBride*, a principal "may not be wilfully ignorant, nor may he purposely shut his eyes to means of information within his possession and control and thereby escape ratification."[27] Ockey was thirty-six when the 1994 conveyance took place. He had access to all relevant records concerning his ownership of the ranch and he signed a document directing Uncle Nick and the other trustees to transfer his real property interest to the holding company. Ockey's failure to object to the 1994 conveyance constitutes ratification—either consciously or through willful ignorance—of the actions taken on his behalf.

¶ 32 The purpose of doctrines like ratification and apparent authority is to avoid instances where a technicality can be used to evade a contract despite the expectations of both parties. It is well established in our case law that an individual cannot go along with a contract for the purpose of enjoying benefits that "although not directly conferred by the contract, are nevertheless made possible as a result of the contract, only to later claim a right to rescind when he discovers the benefits ... will not be great enough to compensate him for the loss he will sustain by reason of the fraud."[28] Ockey's entire argument regarding the illegality of the 1994 conveyance rests on the premise that when the trust terminated in 1986, ownership vested in him, rendering the latter conveyance void. But because the 1994 conveyance was merely voidable, it was capable of ratification by Ockey. Ockey ratified the conveyance by directing the trustees to convey his interest

to IMHG in exchange for a partnership interest in IMHG and by accepting the benefits of his family's efforts to develop the ranch. For these reasons, we uphold the district court's determination that Ockey ratified the 1994 conveyance and affirm the court's summary dismissal of his quiet title and declaratory relief claims.

## II. OCKEY'S CONVERSION CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

¶ 33 Ockey also alleged a conversion claim against Lehmer and IMAI based on the 1993 stock transfers in which Lehmer accepted the stock of IMAI from two developers who defaulted on payments owed to the family. Rather than distributing the IMAI stock to the family according to their proportionate interest in the ranch property, Lehmer canceled the original stock and reissued stock that he sold to family members in order to raise the capital necessary for furthering development. The district court dismissed Ockey's conversion claim against Lehmer and IMAI, holding that it was barred by the statute of limitations. Because Ockey cannot invoke the equitable discovery rule, and because his conversion claim was filed after the three-year statute of limitations expired, we affirm the district court's holding.

¶ 34 The applicability of both the statute of limitations and the equitable discovery rule are questions of law, reviewed for correctness.[29] The subsidiary factual determination of whether Ockey knew or should have known about the alleged conversion is a question of fact that Ockey argues was not supported by the evidence.[30] "Findings of fact ... shall not be set aside unless clearly

---

**27.** 649 P.2d 74, 78 (Utah 1982) (internal quotation marks omitted).

**28.** *Frailey*, 211 P.2d at 845; *see also Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 34, 134 P.3d 1122 (recognizing ratification as part of the equitable principle that "helps to ensure that justice is met and prevents parties from avoiding valid obligations due to technicalities").

**29.** *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 18, 108 P.3d 741.

**30.** *See id.* ¶ 39 (stating that the point at which a person reasonably should know that he or she has suffered a legal injury is a question of fact).

erroneous...."[31] In determining the sufficiency of the evidence supporting the district court's findings, "[w]e review the evidence in a light most favorable to the trial court's findings and affirm if there is a reasonable basis for doing so."[32]

¶ 35 The district court found that Ockey's conversion claim accrued on July 1, 1993. The statute of limitations for conversion is three years.[33] Ockey's complaint was not filed until June 19, 1997, several months after the statute of limitations had run. But Ockey argues that his late filing was excused because the equitable discovery rule tolled the statute of limitations.

¶ 36 The equitable discovery rule operates to "toll a statute of limitations until the time at which a party discovered or reasonably should have discovered 'facts forming the basis for the cause of action.' "[34] There are two versions of the rule: (1) the concealment version, requiring the plaintiff to show that he did not know about the events giving rise to his claim due to "the defendant's concealment or misleading conduct," and (2) the exceptional circumstances version, requiring the plaintiff to show the existence of exceptional circumstances such that application of the general statute of limitations would be "irrational or unjust."[35]

¶ 37 Because Ockey has not asserted the existence of any exceptional circumstances, we evaluate Ockey's claim only under the concealment version of the equitable discovery rule. To prevail, Ockey must show that he did not know, and could not have reasonably known, about the events giving rise to his injury before the statute of limitations ran.[36] Ockey did not raise the alternative argument that he "acted reasonably in failing to file suit before the limitations period ex-

pired."[37] Therefore, we do not address this argument.

¶ 38 Ample evidence supports the district court's conclusion that Ockey either knew, or had reason to know, of the 1993 stock transfers within three years of their occurrence. For example, the district court found that as early as 1993 or 1994, Ockey knew that IMAI stock had been issued to other family members because he had ready access to all relevant records concerning the ranch and because Ockey asked Uncle Nick if he could buy some of Uncle Nick's IMAI stock. Moreover, Ockey knew that family members were being compensated with IMAI stock for their work on behalf of IMAI. And he was knowledgeable regarding IMAI business affairs, such as the fact that his mother was president of IMAI and his cousin was a member of the IMAI board. Ockey had also seen an IMAI stock ledger, shown to him by his mother, that reflected who had shares in the corporation. Based on these facts, the district court found, as a matter of fact, that Ockey "either knew or had reason to know of the events giving rise to a conversion claim within three years after any conversion of IMAI stock." Although the district court did not clearly state when in 1993 or 1994 these events occurred, viewing the evidence in the light most favorable to the trial court's findings, we must assume that the events occurred prior to June 19, 1994.

¶ 39 The evidence listed by the district court is sufficient to show that Ockey knew, or had reason to know, of the events giving rise to his conversion claim before the three-year statute of limitations expired in 1996. Thus, the equitable discovery rule is not applicable, and the district court correctly dis-

---

31. Utah R. Civ. P. 52(a).

32. *Reinbold v. Utah Fun Shares*, 850 P.2d 487, 489 (Utah Ct.App.1993); *see also Grayson Roper Ltd. P'ship v. Finlinson*, 782 P.2d 467, 470 (Utah 1989) ("To successfully attack a trial court's findings of fact, an appellant must first marshal all the evidence in support of the findings and then demonstrate that the evidence, including all reasonable inferences drawn therefrom, is insufficient to support the findings....").

33. Utah Code Ann. § 78B–2–305(2) (2008).

34. *Nolan v. Hoopiiaina (In re Hoppiiaina Trust)*, 2006 UT 53, ¶ 35, 144 P.3d 1129 (quoting *Russell Packard*, 2005 UT 14, ¶ 21, 108 P.3d 741).

35. *Russell Packard*, 2005 UT 14, ¶ 25, 108 P.3d 741 (internal quotation marks omitted).

36. *See Nolan*, 2006 UT 53, ¶ 36, 144 P.3d 1129.

37. *Russell Packard*, 2005 UT 14, ¶ 30, 108 P.3d 741.

missed Ockey's conversion claim as barred by the statute of limitations.

## III. OCKEY'S BREACH OF FIDUCIARY DUTY CLAIM FAILS FOR LACK OF A REMEDY

¶ 40 In the district court, Ockey expressly waived the opportunity to prove damages and elected to proceed solely in equity, arguing that he had no adequate remedy at law for his breach of fiduciary duty and conversion claims. As an equitable remedy, he requested the "return" of the stock canceled in the 1993 stock transfers.

¶ 41 Ockey asserts that when Lehmer received the IMAI stock as payment for the developer's default, Lehmer should have distributed the stock to the family members in proportion to their ownership interest in the ranch. Lehmer's decision to cancel the stock and sell reissued stock in order to raise funds, according to Ockey, amounted to conversion and a breach of Lehmer's fiduciary duty. As an equitable remedy, Ockey requested the court to order that Lehmer convey to Ockey a portion of Lehmer's own stock in IMAI—in other words Ockey requested a "return" of the original IMAI stock. Because Ockey's conversion claim is barred by the statute of limitations, we address only his breach of fiduciary duty claim. We affirm the district court's conclusion that Ockey's breach of fiduciary duty claim fails for lack of a remedy.

■■■■ ¶ 42 The availability of a remedy is a legal conclusion that we review for correctness.[38] However, "a trial court is accorded considerable latitude and discretion in

applying and formulating an equitable remedy, and [it] will not be overturned unless it [has] abused its discretion."[39] Moreover, on appeal, we may affirm the district court "on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the [district] court."[40]

¶ 43 We affirm the district court's refusal to grant an equitable remedy for two reasons that differ from those relied on by the district court but that are, nevertheless, apparent from the record. First, an adequate remedy at law exists for the alleged breach of fiduciary duty, rendering an equitable remedy unavailable as a matter of law. Second, even if a legal remedy were unavailable, the remedy requested by Ockey would not be appropriate because it would overcompensate him—granting him a windfall at the expense of the defendants.

### A. Ockey's Request for an Equitable Remedy Fails Because an Adequate Remedy at Law Exists

■■■■ ¶ 44 By waiving his legal claim for damages, Ockey chose to invoke only the equitable jurisdiction of the court. However, "[t]he right to an equitable remedy is an exceptional one, and absent statutory mandate, equitable relief should be granted only when a court determines that damages are inadequate and that equitable relief will result in more perfect and complete justice."[41] The general rule regarding equitable jurisdiction is that "equitable jurisdiction is precluded if the plaintiff has an adequate remedy at law and will not suffer substantial irreparable injury."[42]

---

**38.** *Thurston v. Box Elder County*, 892 P.2d 1034, 1040–41 (Utah 1995) (holding that the *availability* of an equitable remedy is reviewed for correctness but that the trial court's *application and formulation* of an equitable remedy is reviewed for abuse of discretion).

**39.** *U.S. Fuel Co. v. Huntington–Cleveland Irrigation Co.*, 2003 UT 49, ¶ 9, 79 P.3d 945 (internal quotation marks omitted).

**40.** *State v. Robison*, 2006 UT 65, ¶ 19, 147 P.3d 448 (internal quotation marks omitted) (alteration in original).

**41.** *Thurston*, 892 P.2d at 1040.

**42.** *Buckner v. Kennard*, 2004 UT 78, ¶ 56, 99 P.3d 842; *see also Belnap v. Blain*, 575 P.2d 696, 700 (Utah 1978) ("[A] resort to equity for collection of a judgment is not authorized in the absence of a showing of unavailability of collection by legal process ...." (internal quotation marks omitted)); 27A Am.Jur.2d *Equity* § 21 (2008) ("[T]he plaintiff must affirmatively show a lack of an adequate remedy at law on the face of the pleading and from the evidence, and if a complaint on its face shows that adequate legal remedies exist, equitable remedies are not available.").

¶ 45 In *Buckner v. Kennard*, deputy sheriffs in the Salt Lake County Sheriff's Office sought to invoke this court's equitable jurisdiction by requesting back pay as compensation for past pay inequity they suffered in violation of a state civil service statute.[43] We declined to treat their claim as an equitable claim because the deputies had an adequate remedy at law. Furthermore, they did not argue that their injury was substantial, irreparable, unconscionable, or caused by duress.[44]

¶ 46 Similarly, there is an adequate remedy at law for Ockey's claimed injury. In *Broadwater v. Old Republic Surety*, we acknowledged the difficulty of fashioning a remedy for conversion when the property converted, such as stock, fluctuates in value.[45] In light of this difficulty, we adopted the "New York rule, which sets the measure of damages as the highest intermediate value of the stock between the time of conversion and a reasonable time after the owner receives notice of the conversion." [46] This rule "provide[s] the fairest measure of damages to all involved" by indemnifying the plaintiff, the rightful owner of the converted stock, for his loss "without affording a windfall at the expense of the defendant." [47] An alternative rule, allowing the measure of damages to be calculated at the time of trial or at the highest value of the property between the date of conversion and the date of trial, would allow the plaintiff to "ride the stock market at the defendant's risk and expense until trial." [48]

¶ 47 Although the New York rule was formulated in the context of a conversion claim, we find it to be applicable to Ockey's claim for breach of fiduciary duty because Ockey's breach of fiduciary duty claim arises from Lehmer's alleged conversion of the stock. Because the two claims share the same operative facts, we apply the same standard to Ockey's breach of fiduciary duty claim that we would apply to Ockey's conversion claim.

¶ 48 In summary, Ockey had an adequate remedy at law, and he waived the opportunity to pursue it because his preferred remedy would be far more lucrative. Because equitable relief is only available in those cases where legal relief is unavailable, we affirm the district court's refusal to fashion an equitable remedy for Ockey.

### B. Requiring a "Return" of the IMAI Stock Would Overcompensate Ockey

¶ 49 The district court's refusal to order the return of Ockey's IMAI stock is also supported on an independent basis. Requiring that Lehmer deliver IMAI stock to Ockey would be inequitable because it would overcompensate Ockey by awarding him almost fourteen percent of IMAI's stock, which is worth millions today but was of negligible worth at the time of the alleged conversion and breach of fiduciary duty.

¶ 50 When Lehmer took control of the IMAI stock after the developers defaulted, the stock had minimal value. IMAI's only asset was the State Lease, an asset requiring an immediate $6,000 payment in order to retain it. At that point, development of the ranch was not assured, and maintaining the State Lease was an integral part of the envisioned development. Even Ockey believed that the IMAI stock had only nominal value in 1993. The speculative investment in IMAI made by other family members enabled the family to keep the State Lease, which ultimately caused IMAI's value to skyrocket. Granting Ockey's request would allow Ockey to enjoy the benefits of his family members' speculative investment, while avoiding the risks that they all undertook in 1993.

¶ 51 This dynamic, where returning the allegedly converted stock would overcompensate the plaintiff, is the same dynamic that motivated our adoption of the New York rule. Under the New York rule, Ockey's

---

43. 2004 UT 78, ¶ 55, 99 P.3d 842.

44. *Id.* ¶ 57; *see also Thurston*, 892 P.2d at 1042 (declining to order reinstatement as an equitable remedy for wrongful termination where injured party did not show that damages were inadequate or unascertainable).

45. 854 P.2d 527, 531 (Utah 1993).

46. *Id.*

47. *Id.* at 532.

48. *Id.* at 531.

damages would be the highest intermediate value between the time of Lehmer's alleged conversion and breach of fiduciary duty and a reasonable time after Ockey learned about the alleged conversion and breach. Because the district court concluded that Ockey learned about the conversion as early as 1993, his remedy for Lehmer's breach under the New York rule would be minimal because the value of the stock in 1993 was minimal. Had the district court granted Ockey's requested remedy, it would have allowed him to circumvent the New York rule, thereby reaping an unjustified windfall. Such a result would be inequitable because it would effectively allow Ockey to "ride the stock market at the defendant[s'] risk and expense."[49] Accordingly, the district court appropriately refused to fashion an equitable remedy for Ockey that would allow him to receive a windfall at the expense of his family members.

## CONCLUSION

¶ 52 In summary, we affirm the district court's grant of summary judgment, holding that the 1994 conveyance was voidable and capable of ratification by Ockey. We also affirm the district court's dismissal of Ockey's conversion claim as barred by the statute of limitations. Finally, the district court appropriately refused to fashion an equitable remedy for Ockey's breach of fiduciary duty claim.

¶ 53 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice NEHRING concur in Justice PARRISH's opinion.

---

**49.** *Id.; see also Lysenko v. Sawaya,* 1999 UT App 31, ¶ 8, 973 P.2d 445 ("If allowing the plaintiff to elect to recover the converted property itself will over-compensate him for his injury, then the election must be taken away from the plaintiff." (internal quotation marks omitted)).